[L.A. No. 31027. Dec. 12, 1979.]

J. R. NORTON COMPANY, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

4

**COUNSEL**

Dressler, Stoll & Jacobs, Charley M. Stoll, James L. Leather and Donald G. Dressler for Petitioner.

Thomas F. Olson, William S. Marrs, Wm. J. Thomas, Thomas, Snell, Jamison, Russell, Williamson & Asperger, Jay V. Jory, Howard A. Sagaser, Doty, Quinlan, Kershaw & Fanucchi, William A. Quinlan, David E. Smith, Littler, Mendelson, Fastiff & Tichy, George J. Tichy II, Jordan L. Bloom, Lloyd W. Aubry, Jr., and Kathleen M. Kelly as Amici Curiae on behalf of Petitioner.

Marvin J. Brenner, Thomas M. Sobel, Edwin Lowry and Gary Williams for Respondent.

Jerome Cohen, Sanford N. Nathan, Tom Dalzell, Ellen Greenstone, Michael Heumann, Linton Joaquin, George C. Lazar, Dianna Lyons, John Rice-Trujillo and Kirsten Zerger for Real Party in Interest.

## OPINION

**MOSK, J.**—In 1975, the California Legislature enacted the Agricultural Labor Relations Act (ALRA or Act). (Lab. Code, § 1140 et seq.) The Legislature modeled the Act in large part after the comprehensive federal labor relations statutes, the National Labor Relations Act and the Taft-Hartley Act (NLRA), and it established the Agricultural Labor Relations Board (ALRB or Board), which possesses authority and responsibilities comparable to those exercised by the National Labor Relations Board (NLRB), as the agency in charge of the Act's implementation and administration.

In accordance with the policies expressed in the NLRA (29 U.S.C. § 151), the ALRA declares inter alia that "It is hereby stated to be the policy of the State of California to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing . . . for the purpose of collective bargaining or other mutual aid or protection." (Lab. Code, § 1140.2.) A central feature in the promotion of this policy is the Act's procedure for agricultural employees to elect representatives "for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment, or other conditions of employment." (*Id.*, § 1156 et seq.)

This case arises from a challenge to the validity of a representation election. Two principal issues are presented. The first concerns the scope of the Board's discretion to dismiss summarily objections to the election of a representative labor organization under Labor Code section 1156.3, subdivision (c). That section provides that "Upon receipt of" a petition objecting to the conduct of an election, the Board "shall conduct a hearing to determine whether the election shall be certified." The second issue requires us to examine the circumstances in which Labor Code section 1160.3 authorizes the Board to impose the "make-whole" remedy when it dismisses an employer's objections to the conduct of an election, and the employer subsequently refuses to bar-

gain with the elected labor organization in order to obtain judicial review of the Board's action.

We hold that the Legislature did not intend section 1156.3, subdivision (c), to be construed so broadly that it requires the Board to hold a full evidentiary hearing in cases in which the objecting party has failed to establish a prima facie case for setting an election aside. And, after examining the declarations provided by the party challenging the representation election in this case, we conclude the Board did not abuse its discretion by summarily dismissing its objections for failure to set forth a prima facie claim.

We further hold that section 1160.3 does not authorize the Board to impose the make-whole remedy as a matter of course in cases in which an employer has refused to bargain in order to obtain judicial review of the Board's dismissal of his challenge to an election certification. As explained below, the make-whole remedy serves an important compensatory objective when an employer, claiming he is merely challenging the validity of an election, refuses to bargain as a dilatory tactic designed to stifle self-organization by his employees. Blanket imposition of such relief, however, unduly emphasizes compensation by ignoring the important interest in ensuring that legitimate objections to election misconduct are pursued. It thus may ultimately undermine the employees' right to select "representatives of their own choosing" in many cases, because it has a strong potential for deterring the prosecution of legitimate claims in which a reasonable basis exists for contending that an election does not truly express the will of the employees, despite the Board's ruling to the contrary. As a result, we hold that a per se rule requiring make-whole relief whenever an employer ultimately does not prevail in its election challenge is an abuse of the ALRB's discretion.

*Facts*

On January 30, 1976, the United Farm Workers of America (UFW) filed a petition with the ALRB, seeking certification as the bargaining representative for agricultural employees of petitioner J.R. Norton Company (Norton). An election was held on February 6, 1976, and the UFW emerged as the clear winner.[1]

---

[1] The results of the election were as follows: UFW—155; no union—41; void—1; challenged ballots—15.

Norton subsequently filed a timely petition pursuant to Labor Code section 1156.3, subdivision (c), and the applicable ALRB regulation (Cal.Admin. Code, tit. 8, § 20365). The petition set forth 17 objections that Norton alleged warranted setting aside the election. Acting in compliance with the procedural regulations promulgated by the Board (*id.*, § 20365, subd. (e)), the ALRB executive secretary reviewed the objections and accompanying declarations and determined, with respect to 15 of the 17 objections, that the employer had failed to satisfy the administrative requirements for establishing a prima facie case. (*Id.*, subds. (a)-(d).) Accordingly, he summarily dismissed the 15 insufficient objections in a written order that stated the grounds for each dismissal (*id.*, subd. (e)); the remaining 2 objections were scheduled for hearing (*id.*, subd. (g)). Norton appealed to the ALRB from the executive secretary's dismissal of the 15 objections. (*Id.*, §§ 20365, subd. (h), 20393.) The Board, after examining the objections and supporting declarations, affirmed the action of the executive secretary.

An investigative hearing was held soon thereafter concerning the employer's two remaining objections. (*Id.*, § 20370.) On the basis of the evidence presented at the hearing, the examiner concluded that the employer's objections to the election were without merit and prepared an opinion recommending that the UFW be certified as the collective bargaining representative of Norton's employees. Norton filed exceptions to the examiner's conclusions and recommendations (*id.*, § 20370, subd. (d)), but the Board affirmed those conclusions and certified the UFW as the exclusive bargaining representative of Norton's employees. (*J.R. Norton* (May 23, 1977) 3 A.L.R.B. No. 66.)

Rather than accede to the ALRB's certification decision without judicial review, Norton refused to bargain with the UFW. The union consequently brought an unfair labor practice charge against Norton for refusal "to bargain collectively in good faith with [a certified] labor organization." (Lab. Code, § 1153, subd. (e).) Norton explains that although the ALRB had rejected its challenge to the representation election, Norton retained "good faith" doubts as to the validity of the election and desired to challenge the Board's decision in a judicial forum. Under the ALRA, as with the NLRA, an employer is afforded no right to obtain immediate judicial review of the Board's decision certifying a union; he can obtain judicial review only after he has been found guilty of an unfair labor practice in refusing to bargain with the union. (See, e.g., *Nishikawa Farms, Inc.* v. *Mahony* (1977) 66

Cal.App.3d 781 [136 Cal.Rptr. 233]; *A. F. of L.* v. *Labor Board* (1940) 308 U.S. 401 [84 L.Ed. 347, 60 S.Ct. 76]; *Boire* v. *Greyhound Corp.* (1964) 376 U.S. 473 [11 L.Ed.2d 849, 84 S.Ct. 894].) Norton claims it refused to bargain with the union simply because that course of action was the only means available to obtain judicial review of the ALRB certification decision.[2]

Pursuant to stipulation by all the parties, the unfair labor practice charge was transferred directly to the Board. The Board found Norton's refusal to bargain was an unfair labor practice in violation of Labor Code section 1153, subdivision (e). (*J.R. Norton Company* (June 22, 1978) 4 A.L.R.B. No. 39, p. 2.)

In its decision, the Board ordered Norton to take a variety of affirmative actions as remedial measures for its unlawful conduct. The principal remedial aspect of the order challenged in the instant proceeding is the provision embodying the make-whole remedy. On this point, the order reads: "In accordance with our Decision in Perry Farms, supra [4 A.L.R.B. (Apr. 26, 1978) No. 25], we shall order that the employer, rather than its employees, bear the costs of the delay, which has resulted from its failure and refusal to bargain with the union, by making its employees whole for any losses of pay and other economic benefits which they may have suffered as a result thereof...." Pursuant to its regular practice, however, the Board did not specify a definite damage award at this stage; rather, it remanded the matter to the regional director for an initial determination, subject to Board review, of the employer's specific monetary obligation in this case.

After the entry of the Board's unfair labor practice order, the employer filed a petition for writ of review in the Court of Appeal. (Lab. Code, § 1160.8.) It urged the court to set aside the decision on two sep-

---

[2]Norton's support for this claim includes a letter sent by its attorney to Cesar Chavez of the UFW on October 24, 1977. The letter states in relevant part: "This is to further inform you that we...are indicating at this time our refusal to bargain with you, because we feel the certification issued by the Agricultural Labor Relations Board on August 10, 1977, is invalid." And, as a first affirmative defense in its answer to the ALRB's complaint charging it with the commission of an unfair labor practice, Norton stated: "The Certification issued by the ALRB in this matter was done improperly. It was done in excess of the ALRB's Jurisdiction as the Board failed to allow the Respondent a hearing on certain issues raised by the Petition which was timely filed by the Respondent pursuant to 1156.3(c) of the Labor Code.

"Additionally, the Board failed to follow applicable precedents of the NLRA, as provided in 1148 of the Labor Code."

arate grounds. First, it claimed that by summarily dismissing eight of its objections to the election, the Board denied it its right to a full hearing as provided for in Labor Code section 1156.3, subdivision (c).[3] Norton further argued that because of this error the certification of the UFW should be set aside and the matter remanded to the ALRB with directions to afford it a hearing on the eight objections; the setting aside of the UFW certification, of course, would absolve Norton of the unfair labor practice charge. Second, Norton maintained that even assuming the validity of the ALRB certification decision, the Board had nonetheless abused its discretion in applying the make-whole remedy in this case.

After the Court of Appeal summarily denied Norton's petition, we granted a hearing to address the important issues presented by this case.

## I

Our inquiry initially entails an examination of the employer's attack on the ALRB certification decision. Before addressing Norton's contention that the ALRB erred in dismissing its objections, we consider the propriety of the Board's administrative regulations for challenging an election.

## A

Labor Code section 1156.3, subdivision (c), provides: "Within five days after an election, any person may file with the board a signed petition . . . objecting to the conduct of the election or conduct affecting the results of the election. [¶] Upon receipt of a petition under this subdivision, the board, upon due notice, shall conduct a hearing to determine whether the election shall be certified."

The ALRB has promulgated a detailed regulation for the implementation of section 1156.3, subdivision (c). (Cal. Admin. Code, tit. 8, § 20365.) The regulation sets forth the threshold prerequisites that must be met before an objecting party will be entitled to a formal evi-

---

[3]As noted above, the executive secretary had dismissed 15 objections without a hearing; thus the employer apparently concedes that 7 of its objections were properly rejected by summary dismissal.

dentiary hearing.[4] Among these prerequisties is the provision that when a person "alleges that the election was not conducted properly or that misconduct occurred affecting the results of the election," the petition objecting to the election must "be accompanied by a declaration or declarations *setting forth facts which, if uncontroverted or unexplained, would constitute sufficient grounds for the Board to refuse to certify the election.*" (Italics added.) If the declarations do not establish a prima facie case with respect to some or all of the petition's objections, the regulations directs the executive secretary of the ALRB to dismiss

---

[4]Section 20365 states in relevant part: "(a) Within five days after an election, any person may, pursuant to Labor Code Section 1156.3(c), file with the Board a signed petition asserting that allegations made in the election petition filed pursuant to Labor Code Section 1156.3(a) were incorrect, asserting that the Board or regional director improperly determined the geographical scope of the bargaining unit, or objecting to the conduct of the election or conduct affecting the results of the election. An objections petition shall be filed by...service upon the executive secretary...[of] the original and six copies of the following: (1) the petition pursuant to Labor Code Section 1156.3(c); (2) supporting declarations as required by subsection (c) below; (3) a declaration of service of the objections petition and any accompanying declarations or detailed statement of facts, upon all other parties, including the regional director, as provided in Section 20430; and seven copies of the following: (1) the election petition, (2) the notice and direction of election, and (3) the tally of ballots. No extensions of time for filing objections shall be permitted, and no amendments to objections petitions shall be permitted for any reason after the five day filing period has expired.

"(c) Where the objection alleges that the election was not conducted properly or that misconduct occurred affecting the results of the election, the original and each copy of the petition shall be accompanied by a declaration or declarations setting forth facts which, if uncontroverted or unexplained, would constitute sufficient grounds for the Board to refuse to certify the election. Where more than 5 declarations are submitted with a petition, each objection therein shall contain a reference, by number, to the declaration or declarations offered in support of that objection. The facts stated in each declaration shall be within the personal knowledge of the declarant and shall set forth with particularity the details of each occurrence and the manner in which it is claimed that the defect or misconduct did affect or could have affected the outcome. Allegations of misconduct shall include identification of the person or persons alleged to have engaged in the misconduct and their relationship to any of the parties; a statement of where and when the misconduct occurred; and a detailed description of the misconduct including, where speech is complained of, the contents of what was said. Documents and exhibits offered in support of the objections petition shall be identified and authenticated in the declarations. All declarations shall state the date and place of execution and shall be signed by the declarant and certified by him or her to be true under penalty of perjury, which certification should be substantially in the following form: 'I certify (declare) under penalty of perjury that the foregoing is true and correct.' Copies of the declarations and supporting documents or exhibits shall be served upon all other parties with the objections petition, provided that, at the option of the objecting party, a detailed statement of facts can be substituted for the declarations. This detailed statement of facts must provide sufficient detail to allow the opposing party or parties to secure its own witnesses and otherwise prepare itself to counter the objections at an evidentiary hearing."

the insufficient objections without a hearing; in the event of a dismissal, the regulation explicitly permits the objecting party to appeal the executive secretary's action to the Board.[5]

The above administrative requirements are clearly a permissible exercise of the Board's authority to adopt "such rules and regulations as may be necessary to carry out the provisions of [the ALRA]." (Lab. Code, § 1144.) Although the Labor Code itself does not explicitly condition the right to a hearing on the presentation of adequate supporting declarations or compliance with other administrative procedures, it is well established that a statutory hearing requirement does not preclude an agency from setting reasonable threshold standards that must be met before such a right is invoked. *(U.S.* v. *Storer Broadcasting Co.* (1956) 351 U.S. 192, 205 [100 L.Ed. 1081, 1092, 76 S.Ct. 763]; *Denver Stock Yard* v. *Livestock Assn.* (1958) 356 U.S. 282, 287 [2 L.Ed.2d 771, 775, 78 S.Ct. 738]; *Federal Power Comm'n* v. *Texaco* (1964) 377 U.S. 33, 39 [12 L.Ed.2d 112, 116-117, 84 S.Ct. 1105]; *Dyestuffs and Chemicals, Inc.* v. *Flemming* (8th Cir. 1959) 271 F.2d 281, 284-287; *Pharmaceutical Manufactureres Ass'n* v. *Richardson* (D.Del. 1970) 318 F.Supp. 301 311-313.) The rationale for this principle of statutory construction is that "The hearing is solely for the purpose of receiving evidence 'relevant and material to the issues raised by such objections.' Certainly, then, the objections, in order to be effective and necessitate the hearing requested, must be legally adequate so that, if true, the order complained of could not prevail.... Where the objections stated and the issues raised thereby are, even if true, legally insufficient, their effect is a nullity and no objections have been stated. [It is presumed that the Legislature] did not intend the governmental agencies created by it to perform useless or unfruitful tasks. If it is perfectly clear that petitioner's appeal for a hearing contains nothing material and the objections stated do not abrogate the legality of the order attacked, no hearing is required by law." (*Dyestuffs and Chemicals, Inc.* v. *Flemming, supra,* 271 F.2d at p. 286.)[6] Thus, in construing a provision of the

[5]Thus, subdivision (e) of section 20365 provides: "The executive secretary shall dismiss any objections petition or any portion of such petition which fails to satisfy the requirements of subsections (a) through (d) inclusive. Such action of the executive secretary may be reviewed by the Board pursuant to Section 20393."

[6]The statute in *Dyestuffs* provided that "As soon as practicable after [a] request for a public hearing, the Secretary, after due notice, shall hold such a public hearing for the purpose of receiving evidence relevant and material to the issues raised by such objections." (*Id.* at p. 284.) Relying on *Dyestuffs* and the precedents of the United States Supreme Court cited therein, the court in *Pharmaceutical Manufacturers Ass'n* v. *Richardson, supra,* 318 F.Supp. at page 312, similarly concluded that "It is an estab-

Natural Gas Act providing that on the submission of an application for a certificate of public convenience and necessity the Federal Power Commission "shall set" such an application "for hearing," the United States Supreme Court held that "the statutory requirement for a hearing...does not preclude the Commission from particularizing statutory standards through the rule-making process and barring at the threshold those who [fail to] measure up to them...." (*Federal Power Comm'n v. Texaco, supra,* at p. 39 of 377 U.S. [at p. 117 of 12 L.Ed.2d].)

The justifications for applying this principle of statutory construction in the present context are particularly compelling in light of the policies that underlie the ALRA. An important interest to be considered in evaluating administrative regulations for determining the validity of an election is the need for a newly formed labor organization to obtain legitimacy as quickly as practicable. As Archibald Cox has observed with respect to NLRA policy, "The denial of recognition is an effective means of breaking up a struggling young union too weak for a successful strike. After the enthusiasm of organization and the high hopes of successful negotiations, it is a devastating psychological blow to have the employer shut the office door in the union's face. Imposing a legal duty to recognize the union would prevent such anti-union tactics and thereby contribute to the growth of strong labor organizations." (Cox, *The Duty to Bargain in Good Faith* (1958) 71 Harv.L.Rev. 1401, 1408.) Thus, we are reluctant to conclude that an administrative regulation for summary dismissal of inadequate challenges to election certifications is not a reasonable exercise of the Board's authority to adopt rules and regulations for the implementation of Labor Code section 1156.3, subdivision (c).

Further support for sustaining the Board's regulation can be found by an examination of comparable procedural requirements established pursuant to the rule-making authority of the NLRB.[7] The federal regulation provides that objections to the conduct of an election shall be submitted to a regional director, who, like the ALRB's executive secretary, reviews and acts on them in the first instance. (29 C.F.R. § 102.69

---

lished principle of law that an administrative agency...may by general regulations condition the holding of an evidentiary hearing upon an applicant's preliminary showing that 'reasonable grounds' exist therefor despite any unqualified terms of a statute providing for a hearing. [Citations.]"

[7]In a provision similar to that of the ALRA (Lab. Code, § 1144), the NLRA authorizes the NLRB "to make, amend, and rescind, in the manner prescribed by the Administrative Procedure Act, such rules and regulations as may be necessary to carry out the provisions of [the NLRA]." (29 U.S.C. § 156.)

(a)-(c) (1978).) "[I]f it appears to the regional director that substantial and material factual issues exist which, in the exercise of his reasonable discretion, he determines may more appropriately be resolved after a hearing, he shall issue and cause to be served on the parties a notice of hearing on said issues before a hearing officer." (*Id.*, subd. (d).) After the regional director acts on the objections, the NLRB "may decide the matter forthwith upon the record," or "make other disposition of the case," or if it concludes the objections raise "substantial and material factual issues, . . . may direct the regional director or other agent of the [NLRB] to issue and cause to be served on the parties a notice of hearing on said exceptions before a hearing officer." (*Id.*, subd. (f).) Thus, under the federal law "in order to obtain a hearing in a post-election representation proceeding, the objecting party must supply prima facie evidence, presenting 'substantial and material factual issues' which would warrant setting aside the election. [Citation.] [A] hearing is unnecessary where if all the facts contended for by the objecting party were credited, no ground is shown which would warrant setting aside the election. [Citations.]" (*Alson Mfg. Aero. Div. of Alson Indus., Inc.* v. *N. L. R. B.* (9th Cir. 1975) 523 F.2d 470, 472; see, e.g., *N. L. R. B.* v. *Bata Shoe Company* (4th Cir. 1967) 377 F.2d 821, 826.)[8]

The NLRA regulation has been uniformly sustained by federal courts. (See, e.g., *Polymers, Inc.* v. *N. L. R. B.* (2d Cir. 1969) 414 F.2d 999, 1004-1005; *N. L. R. B.* v. *Smith Industries, Inc.* (5th Cir. 1968) 403 F.2d 889, 892; *N. L. R. B.* v. *Air Control Products of St. Petersburg, Inc.* (5th Cir. 1964) 335 F.2d 245, 249; *N. L. R. B.* v. *Joclin Manufacturing Company* (2d Cir. 1963) 314 F.2d 627, 632.) Thus, as stated by Judge Friendly in *N. L. R. B.* v. *Joclin Manufacturing Company, supra,* 314 F.2d at page 632, the NLRB's regulation conditioning a hearing on the existence of "substantial and material" factual issues is "not only proper but necessary to prevent dilatory tactics by employers

---

[8]The principal difference between the federal and state law is that under the NLRA and NLRB regulations, the regional director is required to investigate factual allegations concerning election misconduct prior to deciding whether a hearing is appropriate (29 U.S.C. § 159(c); 29 C.F.R. § 102.69(c) and (d) (1978), whereas under the ALRA and ALRB regulations the burden is on the objecting party to present adequate factual declarations in support of his allegations before a hearing will be held (Lab. Code, § 1156.3, subd. (c); Cal. Admin. Code, tit. 8, § 20365). Norton does not contend that the burden of making such a prima facie showing is unreasonable. Indeed, because it appeals the dismissal of only eight of its fifteen objections, it impliedly concedes the validity of this requirement. As discussed below, Norton's objection to the Board's action in this case is that on the basis of the declarations presented, it established a prima facie case of misconduct.

or unions disappointed in the election returns . . . ." Moreover, it has also been observed that a hearing in the context of administrative action in response to objections concerning election misconduct is properly viewed "'not as an end in itself, but as a means of defending substantive interests.'" (*N. L. R. B.* v. *Air Control Products of St. Petersburg, Inc., supra,* 335 F.2d at p. 249; *N. L. R. B.* v. *Smith Industries, Inc., supra,* 403 F.2d at p. 892.) "'If there is nothing to hear, then a hearing is a senseless and useless formality.'" (*Ibid.*)

■ The foregoing analysis leads us to conclude that Labor Code section 1156.3, subdivision (c), does not require the Board to hold a full hearing in every case in which a party merely files a petition objecting to the conduct of a representation election. Rather, it is permissible for the ALRB to promulgate reasonable rules and regulations setting forth a requirement that a prima facie case must be presented in objections and supporting declarations before a hearing will be held concerning election misconduct. We thus concur in the view expressed by the Court of Appeal in *Radovich* v. *Agricultural Labor Relations Bd.* (1977) 72 Cal.App.3d 36, 45 [140 Cal.Rptr. 24]: "Otherwise, naked assertions of illegality unclothed with the raiments and accouterments designed to protect against an onslaught of inconsequential or frivolous or dilatory acts unsupported by even the undergarments of a prima facie case would frustrate the state policy as set forth in Labor Code section 1140.2." (Fn. omitted.)

We consequently hold that the ALRB's regulation, which conditions a full evidentiary hearing on the presentation of objections and factual declarations that establish a prima facie case, is a reasonable exercise of the Board's rule-making authority. The regulation does not foreclose a party with an adequate objection from obtaining a full hearing on its claim. When the executive secretary dismisses in the first instance a petition or portion thereof, his action is subject to review by the Board pursuant to California Administrative Code, title 8, section 20393. (Cal. Admin. Code, tit. 8, § 20365, subds. (e), (h).) Before acting on an appeal from the executive secretary's dismissal of a petition, the Board requires the party challenging the dismissal to submit relevant information concerning his objections to the conduct of the election, including his petition and supporting declarations.[9] The Board's decision to sus-

---

[9]California Administrative Code, title 8, section 20393, subdivision (a) provides that the appealing party must "set forth with particularity" the basis for his appeal and submit to the Board two copies of the following: "(1) the evidence and legal arguments

tain or dismiss the objections presented on such an appeal therefore entails an examination of the appealing party's arguments and evidentiary support in order to determine whether a prima facie case has been stated.[10] And, although an ALRB union certification is not normally subject to direct judicial review (*Nishikawa Farms, Inc.* v. *Mahony* (1977) *supra,* 66 Cal.App.3d 781, 788; cf. *A. F. of L.* v. *Labor Board* (1940) *supra,* 308 U.S. 401; *Boire* v. *Greyhound Corp.* (1964) *supra,* 376 U.S. 473; but cf. *Leedom* v. *Kyne* (1958) 358 U.S. 184 [3 L.Ed.2d 210, 79 S.Ct. 180]), a party seeking to obtain such review may do so before the Court of Appeal after the Board has found him guilty of an unfair labor practice under Labor Code section 1160.3 (*Nishikawa Farms, Inc.* v. *Mahony, supra,* 66 Cal.App.3d at p. 788; see also Lab. Code, § 1158.)[11] Thus, because the review process provides adequate checks on potential abuses of discretion in cases in which objections to representation elections are summarily dismissed, it is clear that the regulation serves a valid purpose in assuring that the ALRB will not dissipate its limited resources in holding meaningless hearings on claims that are, as a matter of law, insufficient. (See, e.g., *U. S.* v. *Storer Broadcasting Co., supra,* 351 U.S. 192, 205 [100 L.Ed. 1081, 1092]; *Fay* v. *Dowds* (2d Cir. 1949) 172 F.2d 720, 725.)

which the party seeking review contends support the request; (2) the representation petition; (3) the petition pursuant to Labor Code Section 1156.3(c) where applicable; (4) the regional director's notice of dismissal of the representation petition and statement of reasons therefor, where applicable; and (5) evidence that the aforementioned material has been served upon all parties pursuant to Section 20430."

[10]It is clear that the ALRA authorizes the Board to direct the regional director in the first instance to assess whether a sufficient prima facie case has been presented to entitle the objecting party to a hearing. This delegation is permissible not only under the Board's authority to adopt reasonable rules and regulations to avoid holding unnecessary hearings (Lab. Code, § 1144), but also pursuant to Labor Code section 1142, which grants the Board broad discretion in establishing regional offices and in delegating responsibilities to the personnel thereof, including the authority "to investigate and provide for hearings" and "to certify the results of [a representation] election." The NLRA also contains a provision authorizing the NLRB to exercise similar discretion in delegating authority to regional personnel with respect to the certification of election results. (29 U.S.C. § 153 (b).) The Board's administrative regulations for review of action taken by the executive secretary (Cal. Admin. Code, tit. 8, § 20393), and the potential for judicial review of an election proceeding pursuant to an unfair labor practice action (Lab. Code, §§ 1158; 1160.3; see also discussion in part II, *post*), provide a sufficient check against arbitrary administrative action.

[11]Indeed, under the NLRA it is commonplace for a party challenging an election to pursue this procedural course in order to obtain judicial review. (*Lipman Motors, Inc.* v. *N. L. R. B. (2d Cir. 1971) 451 F.2d 823, 829; see, e.g., Alson Mfg. Aero. Div. of Alson Indus., Inc.* v. *N. L. R. B.* (9th Cir. 1975) *supra,* 523 F.2d 470; *N. L. R. B.* v. *Clarytona Manor, Inc.* (7th Cir. 1973) 479 F.2d 976; *Sonoco Products Company* v. *N. L. R. B.* (9th Cir. 1971) 443 F.2d 1334; *N. L. R. B.* v. *Offenhauser Company* (5th Cir. 1971) 438 F.2d 104.) As discussed above, this course is necessary because the

## B

Having concluded that the ALRA's administrative regulation is valid, we next examine whether the executive secretary and the Board erred in concluding that the declarations accompanying Norton's various objections failed to set forth "facts which, if uncontradicted or unexplained, would constitute sufficient grounds for the Board to refuse to certify the election." As explained below, we conclude the executive secretary and the Board properly determined, in light of ALRB precedents, that the employer's factual declarations, even if true, did not warrant overturning the election.

## 1

We examine first the four objections that relate to alleged improper union activity and other disruption in the vicinity of one of the polling areas. These objections allege that during the five and one-half hours when voting occurred at the Calexico Employment Development Department (EDD) office (also known as "the hole" or "el hoyo"): (1) the union was guilty of misconduct for engaging in "electioneering," "coercion," and "surveillance" of the voting employees, (2) other disruptive events occurred in the polling area that undermined the integrity of the election, and (3) the Board agent who supervised the election was guilty of misconduct in permitting the above activities to occur. Because the objections are interrelated, if Norton's declarations fail to demonstrate that any union misconduct or other significant disruption occurred, its objections to the Board agent's supervision must also be rejected.

In support of its allegations of union misconduct, Norton proffered two declarations. The first, by Verne Smith, one of Norton's supervisors, discloses that during the time the polls were open at the Calexico

NLRA, like the ALRA, permits a party to obtain judicial review of an election certification only after that party has been found to have committed an unfair labor practice. The congressional intent behind this procedure was discussed by the United States Supreme Court in *Boire v. Greyhound Corp., supra,* 376 U.S. at pages 478-479 [11 L.Ed.2d at pages 853-854]: "both the House and the Senate Reports spelled out the thesis, repeated on the floor, that the purpose of § 9(d) was to provide 'for review in the courts only after the election has been held and the Board has ordered the employer to do something predicated upon the results of the election.' Congressional determination to restrict judicial review in such situations was reaffirmed in 1947, at the time that the Taft-Hartley amendments were under consideration, when a conference committee rejected a House amendment which would have permitted any interested person to obtain review immediately after a certification because, as Senator Taft noted, 'such provision would permit dilatory tactics in representation proceedings.'" (Fns. omitted.)

EDD office, Smith drove by the polling site on a number of occasions and on each occasion noticed that union organizers were standing at the entrance to the parking lot of the EDD building, stopping cars as they drove into the lot, questioning the occupants, and then writing something down.[12] The second declaration was signed by a voting employee. It states that as he was going to vote he was approached by two persons who asked him his name and how he was going to vote;[13] the declaration does not, however, identify the persons who approached the voter, nor does it declare that union organizers were polling the employees.

The executive secretary concluded the facts set forth in these declarations would not, even if true, constitute sufficient grounds for the Board to refuse to certify the election. He relied on two ALRB decisions, *Toste Farms, Inc.* (Dec. 5, 1975) 1 A.L.R.B. No. 16, and *William Dal Porto & Sons, Inc.* (Dec. 11, 1975) 1 A.L.R.B. No. 19. The Board sustained the action of the executive secretary by its denial of Norton's appeal. ■ Norton now contends the Board erred in its dismissal of its union misconduct objection. It argues first that the union engaged in improper electioneering in the vicinity of the polling place by stopping cars and conversing with the occupants at the parking lot entrance. The principal authority in support of this argument is *Michem, Inc.* (1968) 170 N.L.R.B. 362. In *Michem,* the NLRB overturned an election because a union representative had engaged in conversations with employees waiting to vote at the polling place, even though the content of the conversations was unknown. The NLRB reasoned: "[T]he potential for distraction, last minute electioneering or pressure...between representatives of any party to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct, without inquiry into the nature of the conversations. The final minutes before an employee casts his vote should be his own, as free from interference as possible. Furthermore, the standard here applied

---

[12]Specifically Smith's declaration states in relevant part: "We drove by 'the hole' about 1-1/2 hours later. We noticed at that time that some of the organizers were standing at the east entrance to 'the hole' and were stopping cars as they drove into the parking lot. The organizers would question each person and would write something down on paper that they had in their possession. We then drove to the west entrance to 'the hole' and found that there were organizers at the west entrance also. We returned again in an hour and found that the same thing was happening....We came back intermittently the rest of the day and without fail there were always organizers at the gates."

[13]The voting worker's declaration states in full: "I was walking through the gate of El Hoyo [the Hole] to vote. I was [approached] by [two] persons. One was [carrying] a pad of paper, and ask[ed] how I was going to vote and ask[ed] my name."

insures that no party gains a last minute advantage over the other, and at the same time deprives neither party of any important access to the ear of the voter. The difficulties of recapturing with any precision the nature of the remarks made in the charged atmosphere of a polling place are self-evident, and to require an examination into the substance and effect of the conversations seems unduly burdensome and, in this situation, unnecessary. Finally, a blanket prohibition against such conversations is easily understood and simply applied." (*Id.* at p. 362; see also *Pastoor Bros. Co.* (1976) 223 N.L.R.B. 451; *N. L. R. B. v. Skelly Oil Co.* (8th Cir. 1973) 473 F.2d 1079.)

The prophylactic language in *Michem,* however, must be considered in light of the circumstances that led the NLRB to conclude improper electioneering had occurred: the union officer in *Michem* had been engaged in "sustained conversations" with employees waiting in line to cast their ballots. Both *Toste Farms* and *William Dal Porto* disclose that the ALRB has concluded such conversations do not necessarily justify the invalidation of an election when they occur outside the immediate voting area.

In *Toste,* the ALRB contrasted the facts of *Michem* with circumstances in which union representatives stop automobiles and converse with the occupants in an area between a public road and the polling booth. And in *William Dal Porto* the Board declined to apply *Michem* in a case in which electioneering allegedly took place, as in the instant case, at the entrance to a parking lot by the voting area. It stated: "The *Michem* rule has been held not to apply to conversations with prospective voters unless the voters are in the polling area or in line waiting to vote. Harold W. Moore, 173 NLRB [No.] 191, (1968). . . . In *Moore* the election took place in a warehouse and the polls were located 10 yards from the entrance to that warehouse. The offending conversation took place in a parking lot 10 yards from the building's entrance. The NLRB ruled that the conduct was not so near the polls as to be objectionable. Here, whatever conversations might have taken place, occurred at the entrance to a parking lot at least 100 and perhaps as much as 200 yards from the polling place. Such conversations, if they occurred, did not affect the outcome of this election." (1 A.L.R.B. No. 19, at p. 7.)

In the instant case, we cannot conclude the Board abused its discretion in ruling that *Toste Farms* and *William Dal Porto* were controlling, rather than the NLRB's *Michem* decision. Norton's decla-

rations do not establish that any electioneering took place near the actual balloting place, nor do they suggest that the union engaged in any conversations with voting employees while they were waiting in line to vote. Rather, Norton's declarations disclose only that union representatives conversed with voters, as in *William Dal Porto,* at the entrance to the parking lot of the building in which the voting took place. Neither ALRB nor NLRB precedent warrants the invalidation of an election as a result of conversations that occur between union representatives and voting employees at such a location, absent information concerning the content of the conversations or other evidence suggesting the activity had a potential for interfering with the employees' free choice. As explained below, no such evidence has been presented in this case.[14] Moreover, the election results were not close. (Fn. 1, *ante.*) We consequently uphold the ALRB's dismissal of Norton's objection on this ground.

Norton's other objection concerning union misconduct is that the UFW engaged in coercion and surveillance by asking employees, as they were approaching the polling area, their names and how they were going to vote. We observe initially that Norton's declarations do not establish that the union asked any employee how he was going to cast his ballot. As noted above, the one declarant alleging that such a question was asked does not identify the source of the question. (Fn. 13, *ante,*) Thus, Norton has failed to establish a prima facie case that such union misconduct in fact occurred.

---

[14]Norton asserts *Toste Farms* and *William Dal Porto* are inapplicable in the instant case because they involve electioneering that took place a substantial distance from the polls. In *Toste,* one objection alleging improper electioneering was based on a union flag displaying a UFW symbol 1,500 to 2,000 feet from the polling place, and another on conversations that occurred between union representatives and voting employees 1,500 feet from the polling area on a public road. In *William Dal Porto,* a union representative with a flag had been stationed approximately 200 to 300 yards from the voting place, and a union organizer was stopping cars and speaking to the occupants at a parking lot entrance located 100 to 200 yards from the actual balloting area.

While distance is certainly relevant in determining whether an election should be overturned as a result of union electioneering, Norton's declarations, as noted above, fail to establish the alleged electioneering by the parking lot entrance occurred so near the immediate balloting area that it had a potential for interfering with the voter's free choice. Although the Smith declaration discloses that the election supervisor said, "the organizers and officers of the company should not be in the parking lots area from one end to the other, including the road," it does not provide any information concerning the location of the parking lot entrance in relation to the actual balloting place. Moreover, there is absolutely no basis in the record for concluding the alleged electioneering occurred any closer to the immediate voting area than in *Toste* or *William Dal Porto.*

■    With respect to Norton's allegation that the union was asking voters their names, it is clear from ALRB precedent that the asking of such questions, even if the answers are compiled on a list, is in itself an insufficient ground for invalidating an election. In *Toste Farms,* the Board explained that whereas the permissibility of such a check-off procedure was suspect under NLRB precedent (compare *Piggly-Wiggly # 011,* (1967) 168 N.L.R.B. 792, with *Craddock-Terry Shoe Corporation* (1948) 80 N.L.R.B. 1239, 1240-1241, in view of the unique characteristics of elections under the ALRA the use of check-off lists should not be considered "per se impermissible conduct such as to warrant setting an election aside."[15] The Board cautioned, however, that it would take a different view of such a check-off procedure "where it occurs in a context of coercion or intimidation such that voters may reasonably regard the checking off of their names as involving undue pressure upon them to vote or not to vote, or as constituting an implicit threat of surveillance as to how they voted." Because there was no evidence of such coercion or intimidation in *Toste,* the ALRB held that the check-off procedure did not warrant the invalidation of the election. In *William Dal Porto,* the employer raised a similar claim that the union had engaged in improper conduct by writing down several voters' names. The Board stated: "The checking off of these names did not occur as part of an atmosphere of coercion or intimidation. Accordingly, our finding in Toste Farms Inc., 1 ALRB No. 16 (1975), is applicable here. There was no additional conduct which might constitute sufficient grounds for setting aside this election." (1 A.L.R.B. No. 19, at p. 9.)

---

[15]The Board explained its reasons for concluding that the use of check-off lists were more justifiable in the ALRA context than in NLRA matters as follows:

"Informing workers of the time and place of the election and insuring the vote is more difficult in elections conducted under the Agricultural Labor Relations Act than under the NLR[A]. [¶] Elections held under the National Labor Relations Act are announced enough in advance to enable the Board and the parties to notify the voters. Voters often congregate in central places and can be notified together. Most voters can read. Employees work in a more concentrated area than do most agricultural employees in California. Therefore, shortly before an election begins, and at intervals thereafter, all employees can be notified, often over a public address system that the polls are open. In addition, NLRB decisions require that workers be employed by the employer on the day of the election, thereby increasing the chance that the worker is aware of the opportunity to vote. See, for example, *Plymouth Towing Company, Inc.* 178 NLRB 651. There is no such requirement under the Act Labor Code § 1157.

"Agricultural workers may be scattered over many acres. They cannot be contacted by public address system. Board agents or union representatives may not know where particular crews are working or how many crews there are. In addition, eligible voters not working for the employer on the day of the election cannot be notified at the work place of the time and place of voting. Agricultural workers who are not citizens may have no previous experience of voting in any election. Many workers cannot read the notice of election, even if they see it. Since there is often only a day or less between the

In view of *Toste* and *William Dal Porto,* we conclude the executive secretary and the Board correctly decided the facts offered in the employer's declarations were insufficient to establish a prima facie case that the election should be overturned as a result of a union check-off list. As we have noted, the declarations stated only that union organizers had been seen stopping cars at the entrance of the EDD parking lot, talking with prospective voters, and writing down unspecified information. It has thus not been established what information the union organizers were allegedly compiling. Moreover, although the petition repeatedly characterizes the union organizers' conduct as "coercion," the declarations relate no instances in which the union engaged in threatening or hostile tactics, and do not reveal any facts to suggest that the election process in this case was conducted in an "atmosphere of coercion or intimidation." (Compare, e.g., *Sonoco Products Company* v. *N. L. R. B.* (9th Cir. 1971) *supra,* 443 F.2d 1334; *N. L. R. B.* v. *Southern Paper Box Company* (8th Cir. 1973) 473 F.2d 208.) While, as the Board has acknowledged, union lists of those who have voted must be viewed with caution, the facts alleged herein do not provide sufficient grounds for concluding that such a list, if indeed one were being kept, interfered with a free election.

■ Norton's next polling area objection is that the election site could not be properly supervised, a circumstance which impaired the integrity of the election because disruption occurred. The executive secretary dismissed the objection by relying on *Perez Packing, Inc.* (Jan. 20, 1976) 2 A.L.R.B. No. 13. When the situation surrounding the *Perez* election is compared with the facts alleged in the instant case, it is clear that the dismissal of this objection was not an abuse of discretion.

The Board characterized the disruption in *Perez* as follows: "the polling area inside the Perez packing shed consisted of a small office located two to three feet down a hallway from the shed's loading dock. During the election the Perez employees were congregated around this loading dock drinking beer, yelling and chanting UFW slogans which were clearly audible inside the designated polling area. The employer's

announcement of the time of the election and the election, workers have less opportunity than they would under the NLRA to get word of the election." (1 A.L.R.B. No. 16, at p. 8.)

Under these circumstances, the Board could properly conclude that federal NLRA precedent was not strictly applicable to the California agricultural labor relations setting. (See *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 412-413 [128 Cal.Rptr. 183, 546 P.2d 687].)

observers testified that many voters had been drinking and some appeared intoxicated as they came to cast their ballots. At least one voter fell inside the polling place and had to be assisted to his feet by the Board agents. [¶] Although there was no evidence of beer drinking inside the polling area itself, the employer's observer stated that two employees were sometime seated on a plank across the narrow hallway from the door to the polling area drinking beer and looking inside the office. Furthermore, she testified that at times the noise from the chanting and cheers of the crowd outside became so loud that it seemed as though the crowd was actually inside the polling area. The Board agents either could not or would not control the situation." (*Id.* at pp. 5-6.)

Norton's declarations merely disclose (1) the voting area was a public place at which shippers picked up and let off their men and (2) two drunks at one point during the five and one-half hours at "the hole" tried to vote. The declarations do not suggest the shippers' men caused any disruption, or even that they were in a position to do so. With respect to the two intoxicated persons, it is not shown that they requested to vote while any eligible voters were present, that they prevented any worker from voting, or that their presence in any way affected the outcome òf the voting. It is thus clear that the declarations do not establish a prima facie case in support of Norton's claim that the election was disrupted.

Norton's final polling area objection is that the Board agent did not exercise adequate supervision at the election site. Because Norton has failed to establish any support of its claims that union misconduct or other disruption occurred, we conclude this objection is without merit.

2

Three of the four remaining objections related to "access rule" violations that were allegedly committed by the union in the week preceding the election. In a number of recent decisions, the ALRB has held that while a union's violation of the access rule may subject both the union and the individual wrongdoer to sanctions (Cal. Admin. Code, tit. 8, § 20900, subd. (e) (5)), such a violation will not constitute grounds for setting aside an election in the absence of proof that the "excess access" taken by the union was of such a character as to have had an intimidating impact on employees or in any other way affected the outcome of

the election. (*K.K. Ito Farms* (Oct. 29, 1976) 2 A.L.R.B. No. 51, p. 8; *Dessert Seed Co.* (Oct. 29, 1976) 2 A.L.R.B. No. 53; *Bruce Church, Inc.* (Dec. 13, 1977) 3 A.L.R.B. No. 90; *Martori Brothers Distributing* (Jan. 27, 1978) 4 A.L.R.B. No. 5; cf. *Belridge Farms* v. *Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 559 [147 Cal.Rptr. 165, 580 P.2d 665].)

■ In the instant case, the factual declarations relating the alleged access violations contain no suggestion whatsoever that the union's violations were of an intimidating or coercive nature. In one instance, the access violation allegedly occurred when an organizer "told everybody to quit at 4:00" to attend a union meeting; this declaration goes on to state, however, that no workers complied with the organizer's request. The only other specific access violation described in the declarations allegedly occurred the day before the election, when several organizers purportedly admitted to a Board agent that they had been on the employer's property for two hours, rather than the one hour permitted by the access rule; the declaration, however, contains no facts suggesting that the organizers had conducted themselves in an intimidating or coercive fashion; moreover, when their violation was pointed out to them, the organizers immediately left at the Board agent's direction. Given the insufficiency of these declarations, the executive secretary properly dismissed without a full hearing the objections relating to the union's alleged access violation.

3

Norton's final objection is that the Board agent committed misconduct by changing one of the polling sites at a time when it was impossible to inform the employees of the change. Although the executive secretary did dismiss one objection on this issue, he also directed that a hearing be held on a separate, virtually identical objection, which raised the issue in terms of "whether the board agent held the election at a time and place which prevented a substantial number of employees from voting." After a full hearing on this matter, the hearing examiner concluded that the Board agent had not erred but had acted reasonably in selecting the ultimate sites of the election; the Board upheld that conclusion and the employer has not contested the ruling. Accordingly, because of the duplication of the two objections, the executive secretary committed no prejudicial error in dismissing one objection while setting a similar objection for hearing.

For the foregoing reasons, we conclude that under the applicable administrative regulations the executive secretary and the Board properly dismissed the eight objections without a hearing. Inasmuch as the employer has not challenged the Board's certification on any other ground and has conceded that it refused to bargain with the union despite certification, we conclude that the Board properly found the employer guilty of an unfair labor practice under section 1153, subdivision (e).

## II

Norton's second contention is that the ALRB erred in applying the make-whole remedy to the instant facts. Before examining the merits of this thesis, we explain the Board's asserted justification for its application of such relief in these circumstances.

The Board derives its authority to impose the make-whole remedy from Labor Code section 1160.3. That section provides that when the Board finds an employer guilty of an unfair labor practice for refusal to bargain in good faith, it may enter an order "requiring such person to cease and desist from such unfair labor practice, to take affirmative action, including reinstatement of employees with or without backpay, and *making employees whole, when the Board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain,* and to provide such other relief as will effectuate the policies of this part." (Italics added.) ■ As previously explained, an ALRB ruling concerning the validity of a representation election is not subject to direct judicial review, and thus a person who wishes to challenge such a ruling in the court must first engage in an unfair labor practice in violation of section 1153, subdivision (e). Once the Board finds the person has committed an unfair labor practice and enters an order requiring him to cease and desist from the practice or to take other action with respect thereto, the order is subject to judicial review pursuant to Labor Code section 1160.8; that section explicitly permits an election to be "reviewed as provided in Section 1158." The course of action taken in these circumstances is often referred to as a "technical" refusal to bargain.

In *Perry Farms, Inc.* (Apr. 26, 1978) 4 A.L.R.B. No. 25, reversed on other grounds (1978) 86 Cal.App.3d 448 [150 Cal.Rptr. 495], the Board announced a blanket rule for the application of the make-whole remedy in all cases in which an employer is found to have refused to

bargain in contravention of Labor Code section 1153, subdivision (e). (*Id.* at p. 9; see also *Adam Dairy* (Apr. 26, 1978) 4 A.L.R.B. No. 24, p. 6.) Thus, when an employer commits a technical refusal to bargain in order to challenge before the courts the propriety of an election, and the challenge is subsequently rejected, his action falls within the scope of this rule.

The Board began its analysis in *Perry* by observing that the ALRA was enacted to "'ensure peace in the agricultural fields by guaranteeing justice for all agricultural workers and stability in labor relations,'" to "'bring certainty and a sense of fair play'" to the employer/employee relationship," and to protect the employees' right of free choice in the selection of their collective bargaining agent. The Board then reasoned that "when an employer refuses to bargain with the certified representative of its employees it commits an act which strikes at the very heart of the system of labor-management relations which the Legislature sought to create. It has thereby deprived the employees of the statutorily created right to be represented by their Board-certified agent in the negotiation of the wages, hours, and other terms and conditions of their employment." (4 A.L.R.B. No. 25, at p. 10.)

The employer in *Perry* contended that, in determining whether imposition of the make-whole remedy is appropriate, the Board should distinguish between instances in which an employer's refusal to bargain is "flagrant" or "willful" and those in which it is motivated simply by a good faith desire to obtain judicial review of a "debatable" administrative certification decision. The Board, however, rejected this suggestion. It stated: "The employees suffer [the] same loss [i.e., deprivation of collective bargaining rights and the economic benefits that flow therefrom] whether the employer's refusal to bargain is designed solely to procure review in the courts of the underlying election issues or is of the flagrant or willful variety. This identity of harm is the crux of the question concerning when the remedy ought to be applied. As between the innocent employees and the employer which, having once had the full opportunity to litigate meritorious representation objections before the Board, now seeks a second review in the courts by a refusal to bargain, traditional principles of equity and the goals and policies of the Act require that the employer bear the actual burden of its own conduct. . . . [¶] A contrary conclusion would create a situation in which *only* the employer would be the ultimate beneficiary of its refusal to bargain regardless of the eventual result of its appeal. If it were found by the

court to be under a valid bargaining obligation it would then simply be ordered to bargain with the union; an obligation which it had avoided during the pendency of the Board and court proceedings. In the end, it would likely face a union weakened by attrition and delay. If, on the other hand, its position is sustained by the courts, the employer would be relieved both of the duty to bargain and of any make-whole liability. Such a system contains great incentive for a refusal to bargain. It stands in contradiction of the statutory principles set forth above." (*Id.* at pp. 10-11.)

The Board relied on the foregoing analysis to justify imposition of make-whole relief in this case. Thus, after finding Norton guilty of an unfair labor practice for its technical refusal to bargain, the Board ordered it to make its "employees whole for all losses of pay and other economic benefits sustained by them as the result of [Norton's] refusal to bargain from the date of the UFW's request for bargaining to the date on which [Norton] commences to bargain collectively in good faith and thereafter bargains to a contract or a bona fide impasse." (*J.R. Norton Company,* (June 22, 1978) 4 A.L.R.B. No. 39, p. 5.) Norton and amici curiae contend the Board lacks authority to impose such relief in a categorical fashion when, as in the instant case, the employer has been found guilty of an unfair labor practice solely as a result of a technical refusal to bargain. We agree.

In reviewing the Board's rule for the application of the make-whole remedy, we are cognizant of the principle that an administrative agency is entitled to deference when interpreting policy in its field of expertise. (See, e.g., *Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 194 [85 L.Ed. 1271, 1283, 61 S.Ct. 447, 133 A.L.R. 1217].) Nevertheless, as we observed in *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813-814 [114 Cal.Rptr. 577, 523 P.2d 617].) "It is fundamental in statutory construction that courts should ascertain the intent of the Legislature so as to effectuate the purpose of the law." Thus, when administrative rules or regulations "alter or amend the statute or enlarge or impair its scope," they "are void and courts not only may, but it is their obligation to strike down such regulations. [Citations.]" (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].) In the instant case, we conclude the Board's blanket rule for imposing the make-whole remedy eviscerates important ALRA policy and fundamentally misconstrues the nature of and legislative purpose behind such relief.

## A

Initially, we observe that a principal purpose of the ALRA, as provided in its policy declaration, is to enable agricultural employees to elect "representatives *of their own choosing*...for the purpose of collective bargaining or other mutual aid or protection." (Lab. Code, § 1140.2, italics added.) Labor Code section 1152, which enumerates the rights of employees with respect to the selection of their collective bargaining agent, restates this purpose and further guarantees to employees the right "to refrain from any or all of such activities...."

■ When the integrity of a representation election is being attacked, two competing considerations arise that are both fundamental to the promotion of ALRA policy. The first is the need to discourage frivolous election challenges pursued by employers as a dilatory tactic designed to stifle self-organization by employees. The second is the important interest in fostering judicial review as a check on arbitrary administrative action in cases in which the employer has raised a meritorious objection to an election and the objection has been rejected by the Board. The tension between these two considerations also exists with respect to NLRA policy, which is relevant in this context as a result of the ALRA's provision that applicable NLRA precedents shall govern interpretation of the ALRA. (Lab. Code, § 1148.)

As previously observed, and as discussed by the ALRB in *Perry Farms,* when an employer engages in dilatory tactics after a representation election his action may substantially impair the strength and support of a union and consequently the employees' interest in selecting an agent to represent them in collective bargaining. Thus, in examining the importance of the make-whole remedy in the promotion of NLRA policy, the Court of Appeals for the District of Columbia stated: "Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees. [Citations.] Thus the employer may reap a second benefit from his original refusal to comply with the law: he may continue to enjoy lower labor expenses after the order to bargain either because the union is gone or because it is too weak to bargain effectively." (*International Union of E., R. & M.W., AFL-CIO* v. *N. L. R. B.* [*Tiidee Products*] (D.C. Cir. 1970) 426 F.2d 1243, 1249; see also *United Steelworkers of America, AFL-CIO* v. *N. L. R. B.* (5th Cir. 1974) 496

F.2d 1342, 1351-1352; Comment, *Employee Reimbursement for an Employer's Refusal to Bargain: The Ex-Cell-O Doctrine* (1968) 46 TexasL.Rev. 758, 770; Note, *Monetary Compensation as a Remedy for Employer Refusal to Bargain* (1968) 56 Geo.L.J. 474, 482; Note, *NLRB Power to Award Damages in Unfair Labor Practice Cases* (1971) 84 Harv.L.Rev. 1670, 1671-1674.) The court further noted that make-whole relief compensates employees for losses incurred during the period when collective bargaining does not take place as a result of litigation attacking the propriety of a representation election; it thereby reduces the employer's financial incentive for refusing to bargain in order to avoid the expenses he would be required to pay if he had entered into a collective bargaining agreement. (426 F.2d at p. 1249.) ██ Thus, as is apparent from the court's discussion, make-whole relief serves the salutary purpose of discouraging frivolous election challenges designed to stifle employees' self-organization. (*Id.* at pp. 1249-1250; see also *International Union, U.A., A. & A. Imp. Wkrs. v. N. L. R. B.*, (D.C. Cir. 1971) 449 F.2d 1046, 1048; *Culinary Alliance & Bartenders U., Local 703 v. N. L. R. B.* (9th Cir. 1974) 488 F.2d 664, 666; *United Steelworkers of America, AFL-CIO v. N. L. R. B.* (5th Cir. 1974) *supra,* 496 F.2d at pp. 1351-1352.)

Yet, it does not follow from the foregoing analysis that blanket imposition of the make-whole remedy, as required by the ALRB's *Perry Farms* decision, is justifiable in light of either NLRA or ALRA policy. Indeed, as the court in *Tiidee Products* was careful to caution, "it is as old in philosophy at least as Aristotle, and it is settled in the law as well, that the application of an apparently uniform rule may in reality engender unfair discrimination when like measures are applied to unlike cases." (426 F.2d at p. 1250.)

The ALRB's *Perry Farms* rule requires an employer to make his employees whole for their losses in all cases in which he seeks to challenge the ALRB's election proceedings in a judicial forum, but ultimately does not prevail in the challenge. It makes no distinction between close cases that raise potentially meritorious objections and frivolous challenges pursued as a tactic for stifling union organization.

██ It is clear that make-whole relief is appropriate when an employer refuses to bargain for the purpose of delaying the collective bargaining process. As the United States Supreme Court has pointed out, a principal concern of Congress in drafting the provisions for challenging an election under the NLRA, upon which the review procedures

of the ALRA were modeled, was that deleterious delays in bargaining would be more likely to occur if direct judicial review of NLRB determinations were permitted. (See, e.g., *Boire* v. *Greyhound Corp.* (1964) *supra,* 376 U.S. 473, 477-479 [11 L.Ed.2d 849, 852-854]; *A.F. of L.* v. *Labor Board* (1940) *supra,* 308 U.S. 401, 408-412 [84 L.Ed. 347, 351-354].)[16] It would thwart the purpose of this review procedure if the employer could altogether circumvent it by raising frivolous challenges to elections before courts reviewing final NLRB or ALRB orders, without any risk of being held liable for the losses to employees that result therefrom. Thus, as previously noted, the ALRA explicitly authorizes the ALRB to award make-whole damages. (Lab. Code, § 1160.3.)

Although it is inconsistent with both the NLRA and ALRA to foster the delays that result from judicial review of frivolous election challenges, the policies of neither act support the application of a blanket rule for the imposition of make-whole relief. Such a rule places burdensome restraints on those who legitimately seek judicial resolution of close cases in which a potentially meritorious claim could be made that the NLRB or ALRB abused its discretion. It thereby impairs the im-

---

[16]As Justice Brennan recounted in his dissenting opinion in *Leedom* v. *Kyne* (1958) *supra,* 358 U.S. 184, 191-194 [3 L.Ed.2d 210, 216-217]: "The Congress had before it when considering the Wagner Act the concrete evidence that delays pending time-consuming judicial review could be a serious hindrance to the primary objective of the Act—bringing employers and employees together to resolve their differences through discussion. . . . For this reason . . . Congress set itself firmly against direct judicial review of the investigation and certification of representatives, and required the prompt initiation of the collective-bargaining process after the Board's certification, because of the risk that time-consuming review might defeat the objectives of the national labor policy. [Citation omitted.]

"When the Taft-Hartley amendments were under consideration, employers complained that because § 9(d) allowed judicial review to an employer only when unfair labor practice charges were based in whole or in part upon facts certified following an investigation of representatives, these 'cumbersome proceedings' meant that the employer could have review only by committing an unfair labor practice 'no matter how much in good faith he doubted the validity of the certification.' A House amendment therefore provided for direct review in the Courts of Appeals of Board certifications . . . as from a final order of the Board. Opponents revived the same arguments successfully employed in the Wagner Act debates: 'Delay would be piled upon delay, during which time collective bargaining would be suspended pending determination of the status of the bargaining agent. Such delays can only result in industrial strife. . . . The Senate rejected the House amendment . . . [and] [i]n conference the Senate view prevailed. Senator Taft reported: 'Subsection 9(d) of the conference agreement conforms to the Senate amendment. The House bill contained a provision which would have permitted judicial review of certifications even before the entry of an unfair labor practice order. In receding on their insistence on this portion, the House yielded to the view of the Senate conferees that such provision would permit dilatory tactics in representation proceedings.'" (Fns. omitted.)

portant interest served by the provision in both acts for a check on arbitrary administrative action.

In enacting the NLRA, Congress recognized that judicial review—even of interlocutory orders made in the context of NLRB decisions concerning the validity of a representation election—was necessary to prevent arbitrary NLRB action. It consequently placed no limits on the review of final NLRB orders, and expressly permitted judicial review of interlocutory orders when the employer was subsequently found guilty of refusing to bargain with the union on the basis of the prior interlocutory decree. (Comment, *supra,* 46 TexasL.Rev. at p. 773.) Thus as one commentator has observed, "Congress thought it more efficacious to preclude court review of the representation certification until there was a refusal-to-bargain finding based upon the certification, after which a court could review both the unfair labor practice and the underlying certification." (McGuiness, *Is the Award of Damages for Refusals to Bargain Consistent with National Labor Policy?* (1968) 14 Wayne L.Rev. 1086, 1101-1102.)[17] Under the ALRA, the procedures for judicial review are parallel to those of the NLRA and thus have been construed in light of the federal law. *(Nishikawa Farms, Inc.* v. *Mahony* (1977) *supra,* 66 Cal.App.3d at pp. 786-787.)

The importance of judicial review, as a check on arbitrary administrative action in the context of federal labor legislation, has been explicitly acknowledged by the United States Supreme Court. *(Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 490-491 [95 L.Ed. 456, 468-469, 71 S.Ct. 456]; *May Stores Co.* v. *Labor Board* (1945) 326 U.S. 376, 380 [90 L.Ed. 145, 157, 66 S.Ct. 203]; *A.F. of L.* v. *Labor Board* (1940) *supra,* 308 U.S. at pp. 407-411 [84 L.Ed. at pp. 351-353].)[18] Moreover, with respect to NLRB action in response to election challenges, it is clear from federal precedents that the courts have played an important role in the promotion of NLRA policy by ensuring the NLRB acts to preserve the integrity of the election process.

---

[17]The high court stated that the congressional purpose was "to provide 'for review in the courts only after the election has been held and the [NLRB] has ordered the employer to do something predicated upon the results of the election.'" (*Boire* v. *Greyhound Corp.* (1964) *supra,* 376 U.S. at pp. 478-479 [11 L.Ed.2d at pp. 853-854].)

[18]Thus, in *Universal Camera* the Supreme Court stated that "courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds." (340 U.S. at p. 490 [95 L.Ed. at p. 468].)

(See, e.g., *N. L. R. B.* v. *Georgetown Dress Corp.* (4th Cir. 1976) 537 F.2d 1239 (reversing NLRB certification of union on the ground that conduct by union representatives had vitiated fairness of election); *Turner's Express, Incorporated* v. *N. L. R. B.* (4th Cir. 1972) 456 F.2d 289 (same); *Alpers' Jobbing Co., Inc.* v. *N. L. R. B.* (8th Cir. 1976) 547 F.2d 402 (holding NLRB's election procedures failed to produce an accurate indication of employee sentiment); *Marriott In-Flite Serv. Div. of Marriott Corp.* v. *N. L. R. B.* (5th Cir. 1969) 417 F.2d 563, cert. den. (1970) 397 U.S. 920 [25 L.Ed.2d 101, 90 S.Ct. 929] (same); *Beaird-Poulan Division, Emerson Elec.* v. *N. L. R. B.* (8th Cir. 1978) 571 F.2d 432 (reversing NLRB decision that hearing concerning integrity of election was unnecessary); *N. L. R. B.* v. *Skelly Oil Co.* (8th Cir. 1973) *supra,* 473 F.2d 1079 (same); *N. L. R. B.* v. *Southern Paper Box Co. (8th Cir. 1973) supra,* 473 F.2d 208 (same); *United States Rubber Company* v. *N. L. R. B.* (5th Cir. 1967) 373 F.2d 602 (same); *Electronic Components Corp. of N. C.* v. *N. L. R. B.* (4th Cir. 1976) 546 F.2d 1088 (requiring NLRB to conduct an investigation to determine whether integrity of election had been undermined); *N. L. R. B.* v. *Flomatic Corporation* (2d Cir. 1965) 347 F.2d 74 (overturning NLRB's issuance of bargaining order on the ground that it infringed employees' right to choose their bargaining agent).) The need to avoid placing undue restraints on judicial review in the context of proceedings concerning representation elections must be recognized as especially compelling when one considers that the NLRA and ALRA purpose is not exclusively to promote collective bargaining, but to promote such bargaining by the employees' *freely chosen* representatives. The imposition of make-whole relief undermines this purpose to the extent that it discourages employers from exercising their right to judicial review in cases in which the NLRB or ALRB has rejected their meritorious challenges to the integrity of an election.

The *Perry Farms* rule for the imposition of make-whole relief discloses the ALRB's failure to acknowledge the serious deterrent impact that the rule may have on the employer's incentive to seek judicial review of meritorious objections to representation elections. As one commentator has observed, it is important to recognize that the make-whole remedy "place[s] greater restrictions on judicial review in general and, therefore, will reduce the number of appeal-worthy refusal-to-bargain cases heard by the courts. This will frustrate [the policy] underlying the federal labor legislation. . . . [I]t will deter the initiation of many appeals that would otherwise have been asserted in good faith. Since in many cases the employer might have won on appeal, the deter-

rence of good-faith review might interfere with the employees' right not to be represented by a union...." (Comment, *supra,* 46 TexasL.Rev. at p. 774.)[19] Moreover, it has also been pointed out that the make-whole remedy "is especially harmful to small employers. Many small employers who in good faith believed the [NLRB] to be wrong would have neither the resources nor reserves to risk review of a representation decision if the damage remedy might be imposed upon them if they 'guessed wrong' and lost. The [make-whole] remedy, litigation expenses, and the threat of strike while review was pending, would definitely discourage seeking review. In view of statistics showing that the [NLRB] is reversed in the courts on 40% of the bargaining orders reviewed, such discouragement would appear oppressive and contrary to the Act's policies. [Citation.]" (McGuiness, *op. cit. supra,* 14 Wayne L.Rev. at p. 1102, fn. 89.)[20]

The foregoing considerations lead us to conclude that the ALRB's *Perry Farms* rule of automatic imposition of make-whole relief cannot be sustained on the ground that it promotes ALRA policy by fostering collective bargaining. A central feature of the collective bargaining process is the exercise of the employees' free choice in selecting their bargaining representative. The ALRB's blanket rule for the application of the make-whole remedy does not provide a sufficient guarantee that the integrity of representation elections will be preserved.

---

[19]The potential deterrent impact of the make-whole remedy was also apparently acknowledged by the NLRB when it concluded it lacked the authority to grant such relief. The NLRB stated that when the wrongful refusal to bargain "is, at most, a debatable question, though ultimately found a wrong, the imposition of a large financial obligation on such a respondent may come close to a form of punishment for having elected to pursue a representation question beyond the Board and to the courts...." (*Ex-Cell-O Corporation* (1970) 185 N.L.R.B. 107.)

[20]We find unpersuasive the ALRB's assertion that a uniform rule for imposition of make-whole relief is preferable because of the difficulties in determining whether an employer has in good faith presented a debatable objection to an election. The United States Supreme Court has acknowledged the ability of the NLRB to make a similar determination when deciding whether an award of attorney fees is appropriate. (*NLRB v. Food Store Employees* (1974) 417 U.S. 1, 8-9 [40 L.Ed.2d 612, 617-618, 94 S.Ct. 2074].) The ALRB itself has also recognized it can make such a determination in this context. (*Western Conference of Teamsters (V.B. Zaninovich)* (July 21, 1977) 3 A.L.R.B. No. 57, pp. 7-8.) Further, the difficulties in determining an employer's state of mind are inherent in the obligation of the Board to determine whether a party has committed an unfair labor practice by refusing to bargain in good faith. (See Cox, *The Duty to Bargain in Good Faith* (1958) *supra,* 71 Harv.L.Rev. 1401, 1414.) We have not been presented with any reason for concluding the Board is less capable of making such determinations when deciding whether to award make-whole relief than in deciding whether to award attorney fees or whether a party has refused to bargain in good faith.

## B

The ALRB further contends, however, that make-whole relief is compensatory in nature, and thus its *Perry Farms* rule should be sustained because it ensures that employees will be compensated for their losses when an employer's objections to an election ultimately do not prove to be meritorious.

It is true that make-whole relief is compensatory in that it reimburses employees for the losses they incur as a result of delays in the collective bargaining process. It does not follow, however, that such compensation is justified in every case in which the employer pursues his case in a judicial forum and ultimately does not prevail. As discussed above, when the integrity of an election is being attacked, the pursuit of judicial review in itself is not contrary to the objectives of the ALRA; such review undermines ALRA policy only when the employer's election challenges lack merit and are pursued as a dilatory tactic designed to stifle union organization. The critical inquiry, therefore, is not whether the employees have incurred losses during the period when collective bargaining did not take place as a result of the employer's pursuit of election challenges. Rather, the issue is in what circumstances the employees' losses are compensable under the Act in light of the tension between the interest in avoiding unnecessary delays and the need to provide a check on arbitrary ALRB action in cases in which it rejects meritorious objections to representation elections.

The ALRB further argues that because Labor Code section 1160.3 authorizes it to order make-whole relief when it "deems such relief appropriate," the Act should be interpreted as granting it the authority to impose make-whole damages on the employer without first examining the facts and equities of the particular case. The argument is not supported by either the language or the legislative history of the make-whole provision.

As we observed in *People v. Gilbert* (1969) 1 Cal.3d 475, 480 [82 Cal.Rptr. 724, 462 P.2d 580], "'A cardinal rule of construction is that . . . a construction making some words surplusage is to be avoided.' [Citation.]" Further, in *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224], we stated: "'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' [Citation]; 'a construction making some words surplusage is to be

avoided.' [Citation.] 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]"

The Board's interpretation of the make-whole clause contravenes these principles of statutory construction. Initially, it does so because it treats the words "when the board deems such relief appropriate" as surplusage, and thus fails to accord them adequate significance. Labor Code section 1160.3 provides in relevant part that after the Board finds a person guilty of an unfair labor practice, it "shall . . . cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, to take affirmative action, including reinstatement of employees with or without backpay, and making employees whole, *when the board deems such relief appropriate,* for the loss of pay resulting from the employer's refusal to bargain, and to provide such other relief as will effectuate the policies of this part." (Italics added.) If the Legislature had intended make-whole relief to be imposed every time an employer committed an unfair labor practice by refusing to bargain, it would have been entirely superfluous for it to have included the clause "when the board deems such relief appropriate." Secondly, as discussed above, the ALRB's interpretation of the provision is inconsistent with ALRA policy. Thus, we conclude the Legislature did not intend the phrase "when the board deems such relief appropriate" to be interpreted so broadly as to require make-whole relief in every instance that an employer is found to have committed an unfair labor practice in contravention of Labor Code section 1153, subdivision (e).

This conclusion is further supported by the legislative history of the Act. The hearings before the Senate committee reviewing the bill make it clear that the language explicitly permitting the Board to order make-whole relief was intended by the Legislature to resolve the question of the Board's power to issue such an order, not to grant the Board unfettered discretion to do so in all cases in which an employer ultimately does not prevail in his election challenge. In those hearings, then-Secretary of Agriculture and Services (now Chief Justice) Rose Elizabeth Bird, one of the drafters of the bill, stated that the "language was just placed in because there has been a good deal of discussion with the National Labor Relations Act that it ought to be amended to allow

the 'make-whole' remedy, and this is something that the people who have looked at this Act carefully believe is a progressive step and should be taken. And we decided since we were starting anew here in California, that we would take that progressive step." (Hgs. on Sen. Bill No. 1 (Third Ex. Sess. 1975) before Sen. Industrial Relations Com. (May 21, 1975).)

Secretary Bird further testified that the provision authorizes the Board to award make-whole damages only when the Board has determined that an employer refused to bargain and acted in bad faith. The words "when the board deems such relief appropriate," according to her testimony, were intended to convey the notion that the Board must carefully evaluate the asserted grounds for ordering make-whole relief; such an evaluation necessarily requires the Board to examine the facts and equities of each particular case.[21] Thus, the legislative history reveals the Act did not intend make-whole relief to be applied on an across-the-board basis.

## C

██ Because the Board applied the wrong standard by ruling that Norton's failure to recognize the union while seeking judicial review required per se make-whole relief, the case must be returned to the Board

---

[21]In this respect, the following excerpts from the transcript are instructive:

"ROSE BIRD:...What [the Act] is doing here is *giving discretion to the board to give backpay to employees where there has been bad faith,* and I suggest *that's an equitable remedy.*

"SENATOR ZENOVICH: Is it really giving it discretion? 'If upon the preponderance of the evidence,' beginning at line 19, '...of the testimony taken the board shall be of the opinion that any member named in the complaint has engaged in or "blah, blah, blah..." the board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practices to take affirmative action including reinstatement.' That's mandatory, as I read it. You said it was discretionary.

"ROSE BIRD: No. *What I'm saying is that the board has to be convinced of the matter,* is what I meant to say, and I appreciate the Senator clarifying my language.

"SENATOR ZENOVICH: You want to change 'shall' to 'may'?

"ROSE BIRD: No, I don't, Senator. It says 'when the board deems such relief appropriate...'

"SENATOR ZENOVICH: Now, *that's your discretion,* I see.

"ROSE BIRD: Yes. '...for the loss of pay resulting from the employer's refusal to bargain and to provide for such other relief as will effectuate the policies of this part...'

"SENATOR ZENOVICH: Then it shall do all of these things.

"ROSE BIRD: Right. When the board deems such relief appropriate." (*Ibid,* italics added.)

so that it can apply the proper standard. (Cf. *Labor Board* v. *Truitt Mfg. Co.* (1955) 351 U.S. 149, 157 [100 L.Ed. 1027, 1034, 76 S.Ct. 753] (conc. and dis. opn. of Frankfurter, J.).) ▮ ▪As the United States Supreme Court recently observed, "It is a guiding principle of administrative law, long recognized by this Court, that 'an administrative determination in which is embedded a legal question open to judicial review does not impliedly foreclose the administrative agency, after its error has been corrected, from enforcing the legislative policy committed to its charge.' [Citations.] ... It also affords the [NLRB] the opportunity, through additional evidence or findings, to reframe its order better to effectuate that policy. [Citations.]" (*NLRB* v. *Food Store Employees* (1974) 417 U.S. 1, 9-10 [40 L.Ed.2d 612, 618, 94 S.Ct. 2074].)

▮ On remand, the Board must determine from the totality of the employer's conduct whether it went through the motions of contesting the election results as an elaborate pretense to avoid bargaining or whether it litigated in a reasonable good faith belief that the union would not have been freely selected by the employees as their bargaining representative had the election been properly conducted. We emphasize that this holding does not imply that whenever the Board finds an employer has failed to present a prima facie case, and the finding is subsequently upheld by the courts, the Board may order make-whole relief. Such decision by hind-sight would impermissibly deter judicial review of close cases that raise important issues concerning whether the election was conducted in a manner that truly protected the employees' right of free choice. As discussed above, judicial review in this context is fundamental in providing for checks on administrative agencies as a protection against arbitrary exercises of their discretion. On the other hand, our holding does not mean that the Board is deprived of its make-whole power by every colorable claim of a violation of the laboratory conditions of a representation election: it must appear that the employer reasonably and in good faith believed the violation would have affected the outcome of the election.

In short, a per se remedy is impermissible in this setting. Not only are there degrees of violations (see *Food Store Emp. U., Loc. No. 347 Amal. Meat Cut.* v. *N. L. R. B.* (D.C. Cir. 1973) 476 F.2d 546, 554, fn. 13) but, more fundamentally, other factors peculiar to labor relations may outweigh the appropriateness of make-whole relief in particular cases. (*Phelps Dodge Corp.* v. *Labor Board* (1941) *supra,* 313 U.S. 177, 194-195 [85 L.Ed. 1271, 1283].) The Board's remedial powers do

not exist simply to reallocate monetary loss to whomever it considers to be most deserving; they exist, as appears from the statute itself, to effectuate the policies of the Act.

Let a decree issue (1) setting aside and remanding to the Board the make-whole portion of the order under review, and (2) enforcing the remainder of the order. Each party shall bear its own costs.

Tobriner, Acting C. J., Clark, J., Richardson, J., Manuel, J., and Cobey, J.,* concurred.

Newman, J., concurred in the result.

---

*Assigned by the Acting Chairperson of the Judicial Council.