[Civ. No. 28639. Fourth Dist., Div. One. June 3, 1985.]

RULINE NURSERY CO., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

248

252

**COUNSEL**

Thomas M. Giovacchini, Thomas E. Campagne, James M. Schiavenza, Thomas J. Yin, Campagne & Giovacchini and Campagne & Schiavenza for Petitioner.

Manuel M. Medeiros, Daniel G. Stone and Nancy C. Smith for Respondent.

Dianna Lyons, Federico G. Chavez, Daniel A. Garcia and Wendy Sones for Real Party in Interest.

**OPINION**

**STANIFORTH, J.**—Petitioner Ruline Nursery Co. (Ruline) seeks review of an Agricultural Labor Relations Board (ALRB or Board) decision, 8 ALRB No. 105. The Board found Ruline had (1) refused to bargain with the United Farm Workers (UFW or Union); (2) unilaterally changed the terms and conditions of employment regarding holiday and vacation pay, hours of employment and wages; (3) failed to rehire Pedro Rivas and Guadalupe Ruiz on July 22, 1980, and August 13, 1980; (4) delayed the rehire of Agustin Madrid and Miguel Pereda in November 1980; (5) failed to raise wages of six employees rehired in October 1980; and (6) failed to rehire Agustin Madrid on December 12, 1980. Ruline has stated a myriad (34) reasons why the Board decision is erroneous. We granted hearing because of the novel question (peak employment determination) presented which was fundamental to the Board's finding of a refusal to bargain.

I

In enacting the Agricultural Labor Relations Act (ALRA or Act), the California Legislature specifically declared the collective bargaining process is the preferred method for attempting to bring peace and stability to California's agricultural fields. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 403 [128 Cal.Rptr. 183, 546 P.2d 687], app. dism., 429 U.S. 802 [50 L.Ed.2d 63, 97 S.Ct. 33]; see also Stats. 1975, Third Ex. Sess., ch. 1, § 1, p. 4013; Lab. Code, § 1140.2.) The "central feature" in the promotion of this policy in favor of collective bargaining is the Act's election procedure which insures that workers can freely designate

representatives of their own choosing. (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 28, 30 [160 Cal.Rptr. 710, 603 P.2d 1306].)

Consistent with and in aid of the Act's policy are steps favoring the quick resolution of election proceedings. The California Supreme Court in *Norton, supra,* held under the Act it is very important for a "newly formed labor organization to obtain legitimacy as quickly as practicable." (26 Cal.3d, at p. 15.) Quoting Archibald Cox, the Supreme Court observed: " 'The denial of recognition is an effective means of breaking up a struggling young union too weak for a successful strike. After the enthusiasm of organization and the high hopes of successful negotiations, it is a devastating psychological blow to have the employer shut the office door in the union's face. . . .' (Cox, *The Duty to Bargain in Good Faith* (1958) 71 Harv. L.Rev. 1401, 1408.)" (*Ibid.*)

Unless the Board determines that there are sufficient grounds to refuse to do so, it shall certify the election. (Lab. Code,[1] § 1156.3, subd. (c).) The statutory language providing for quick resolution of election issues is found in section 1156.3, subdivisions (c) and (d).[2]

■ By this language the Legislature has in substance established a presumption in favor of certification with the burden of proof resting with the objecting party to show why the election should not be certified. (*California Lettuce Co.* (1979) 5 ALRB No. 24, p. 4.)

In January 1979, an election was held at Ruline. On June 11, 1980, UFW was certified as the exclusive bargaining agent of Ruline's agricultural employees. Ruline refused to bargain with UFW.

---

[1] All statutory references are to the Labor Code unless otherwise specified.

[2] These subdivisions provide: "(c) Within five days after an election, any person may file with the board a signed petition asserting that allegations made in the petition filed pursuant to subdivision (a) were incorrect, that the board improperly determined the geographical scope of the bargaining unit, or objecting to the conduct of the election or conduct affecting the results of the election.

"Upon receipt of a petition under this subdivision, the board, upon due notice, shall conduct a hearing to determine whether the election shall be certified. Such hearing may be conducted by an officer or employee of a regional office of the board. He shall make no recommendations with respect thereto. If the board finds, on the record of such hearing, that any of the assertions made in the petition filed pursuant to this subdivision are correct, or that the election was not conducted properly, or misconduct affecting the results of the election occurred, the board may refuse to certify the election. Unless the board determines that there are sufficient grounds to refuse to do so, it shall certify the election.

"(d) If no petition is filed pursuant to subdivision (c) within five days of the election the board shall certify the election."

## II

### *The Refusal to Bargain*

The ALRB found Ruline had refused to bargain in good faith, in violation of Labor Code section 1153, subdivision (e), since July 15, 1980. Ruline agreed it had not bargained with the Union, basing its refusal on a challenge to the certification of the UFW as its employees' bargaining representative. The challenge is bottomed upon a contention it did not employ 50 percent of its peak season workforce as required by section 1156.4 at the time the election was held in which UFW was chosen as bargaining representative of the employees. Section 1156.4 provides, in pertinent part: *"[T]he board shall not consider a representation petition or a petition to decertify as timely filed unless the employer's payroll reflects 50 percent of the peak agricultural employment for such employer for the current calendar year for the payroll period immediately preceding the filing of the petition."* (Italics added.)

The payroll period immediately preceding the filing of the petition is the crucial time because it is the employees whose names appear on that payroll who are eligible to vote in the representation election. (§ 1157.)

Here, UFW filed a petition for a representation election on January 3, 1979. The employer's payroll during the payroll period immediately preceding the filing of the petition terminated on December 24, 1978. It contained the names of 28 employees who were within the bargaining unit. In the calendar year 1978, the peak had been the previous January. There were the names of 51 employees on that payroll. The peak in 1979 was in April when 78 employees were on the payroll.

Ruline argues the ALRA requires a determination by the Board that during the payroll period immediately preceding the filing of the petition, Ruline was at 50 percent of the peak it has obtained or will obtain *during the calendar year in which the petition is filed.* The Board found the phrase "current calendar year" refers to the calendar year in which the "payroll period immediately preceding the filing of the petition for certification" falls. It was UFW's position that no matter which construction of the phrase "current calendar year" is adopted, the petition for certification in this election was timely filed and, therefore, this court should uphold the Board's decision.

No case has yet resolved this precise dispute.[3]

---

[3]Ruline inappropriately relies upon *John J. Elmore* (1977) 3 ALRB 63, to support its position. As will appear, *infra, Elmore* is not factually akin to the case at bench.

Ruline contends that when section 1156.4 is read with section 1156.3 and California Administrative Code, title 8, section 20310, subdivision (a)(6), its meaning becomes clear. Section 1156.3, subdivision (a)(1), provides a petition for certification may be filed if that petition states "the number of agricultural employees currently employed by the employer named in the petition, as determined from his payroll immediately preceding the filing of the petition, is not less than 50 percent of his peak agricultural employment for the current calendar year." Section 20310, subdivision (a)(6), provides: "If the employer contends that the petition was filed at a time when the number of employees employed consisted of less than 50% of its peak agricultural employment for the current calendar year,[4] the employer shall provide evidence sufficient to support that contention."

The UFW relies upon the explicit plain language of section 1156.4. This section expressly recognizes agriculture is a "seasonal occupation" for most agricultural employees. It is the seasonal nature of agricultural employment which sets it apart from the industrial setting and led the Legislature to set "peak" agricultural employment requirements in election cases. Only then would a representative number of employees on an employer's payroll be available to vote and, therefore, more accurately reflect the true wishes of an employer's work force. (*High & Mighty Farms* (1977) 3 ALRB No. 88, at pp. 10-11; *Bonita Packing Co., Inc.* (1978) 4 ALRB No. 96, at p. 8; *Wine World, Inc. dba Beringer Vineyards* (1979) 5 ALRB No. 41, at p. 7.)

Eligibility to vote in a Board election is determined by the prepetition payroll (§ 1157). However, the prepetition payroll is only one of several factors the Board uses to determine whether a sufficient portion of the employer's workforce will be making the union representation choice for the bargaining unit. The statutory "50% of peak" requirement is designed to insure seasonal workers' that representational rights are not determined for them, during the "off-season," by a year-around worker minority. (§ 1156.4.) Once the representation decision is made and certified, it cannot be changed for at least a year because of the 12-month statutory election bar. (§§ 1156.5, 1156.7, subd. (c).) ▮ The key to resolving peak issues, therefore, is whether the number of eligible voters is representative of an employer's work force.[5]

---

[4]"Calendar year" is the period from January 1 to December 31, inclusive. (*Clopton* v. *Scharrenberg* (1951) 106 Cal.App.2d 430 [235 P.2d 84].)

[5]The eligible electorate is representative so long as the number of eligible voters is within a narrow margin of 50 percent of the employer's peak employment. (See, *Bonita Packing Co., Inc., supra,* 4 ALRB No. 96, at pp. 10-11; *Wine World, Inc. dba Beringer Vineyards, supra,* 5 ALRB No. 41, at p. 8.)

The burden of resolving the "peak"[6] issue falls initially with the regional director and the Board agent in charge of the election. The parties, however, are required to provide information necessary to the determination. When a party (usually a union) files an election petition, it must allege the employer is at least at 50 percent peak agricultural employment, it must provide an estimate of the number of employees currently employed, and it must set forth the nature of the employer's agricultural commodities. (Cal. Admin. Code, tit. 8, § 20395, subd. (a).) Within 48 hours thereafter, the employer must provide the Board with certain information, including a statement, based on evidence available to the employer, of the highest single payroll period of employment during the preceding year, and a statement of the acreage devoted to each crop during the calendar year. (Cal. Admin. Code, tit. 8, § 20310, subd. (a).) The employer's failure to provide this information may give rise to a presumption the petition is timely filed with respect to the employer's peak season. (Cal. Admin. Code, tit. 8, § 20310, subd. (e)(1).)

Here, the petition for certification was filed on January 3, 1979, and the payroll period, immediately preceding the filing of the petition, occurred from December 11 through 24, 1978. Ruline employed 33 employees (4 of whom were managerial) during that period. Pursuant to its interpretation of section 1156.4, the Board compared Ruline's 33 prepetition payroll employees with the 51 employees working for Ruline during its 1978 peak agricultural payroll period. Since the prepetition payroll reflected more than 50 percent of Ruline's peak agricultural employment, the ALRB found UFW's petition for certification was timely.

Ruline inappositely relies upon the ALRB decision in *John J. Elmore, supra,* 3 ALRB No. 63. The case is not factually nor legally in point. In *Elmore,* the payroll period immediately preceding the filing of a petition for an election and the filing of the petition for the election occurred in the same year, 1975. There was thus no issue raised as to the meaning of "current calendar year," in a situation analogous to this case. In *Elmore,* the petition was filed in November 1975. The regional director found "peak" existed by comparing the payroll immediately preceding the filing of the petition with all the 1975 payrolls preceding the filing of the petition. Ruline, alleging prospective peak, argued the payroll immediately preceding the filing of the petition should have been compared with 1974 payrolls. By the time a hearing was held in 1977, data for the entire year of 1975 was available

---

[6]A "peak" question generally arises when an employer claims it is not at 50 percent peak agricultural employment and that peak has either already occurred (past peak) or will occur in the future (prospective peak).

but Ruline failed to produce it in support of its prospective peak argument. The Board found this nonproduction was, in effect, an admission the regional director's "peak" decision was correct.

In *Elmore, supra,* 3 ALRB No. 63, the ALRB observed section 1156.3 "requires the Board to investigate peak and other allegations in the petition, and to direct an election if it has 'reasonable cause to believe that a bona fide question of representation exists.'" *(Id.,* at p. 4.) Section 1156.4 directs the Board to estimate peak on the basis of acreage and crop statistics applied uniformly throughout California and on all other relevant data. The reason? Section 1156.3, subdivision (a), *requires an election to be held within seven days of the filing of a petition for certification.* Finally, section 1156.3, subdivision (d), limits the filing of objections to an election to within five days after the election. For the foregoing reasons the Board, in representation cases, has consistently followed a policy of upholding elections unless it was clear to do so would violate the rights of employees or to do so would result in an unreasonable interpretation or application of the Act. *(Id.,* at p. 6.) Thus, the key to deciding if an election is timely is "whether the electorate is representative of the bargaining unit which may ultimately be certified." *(Id.,* at p. 5.)

In *Charles Malovich* (1979) 5 ALRB No. 33, a "prospective peak" case, the Board held the review of a regional director's decision to hold an election in all prospective peak cases will be based on "whether the Regional Director's peak determination was a reasonable one in light of the information available at the time of the investigation." *(Id.,* at p. 4; see also *Domingo Farms* (1979) 5 ALRB No. 35, p. 5.) The Board's decision in *Malovich* was upheld in an unpublished opinion (5 Civ. 5751). In *Malovich,* the Board held that to use postelection data as the basis for review of reasonableness in prospective peak cases would run contrary to the Act's policy of placing a "premium on speed and finality in deciding the results of elections." (5 ALRB No. 33, at p. 6.) Furthermore, and more importantly, "it might encourage employers to file groundless objections in prospective peak cases in order to preserve the possibility of ultimately showing that the peak determination, although reasonably made, was incorrect in light of subsequent events. The proposed approach might also encourage employers to manipulate the size of their workforces after elections in order to defeat certification. Furthermore, . . . this approach might discourage employers from cooperating fully in peak investigations." (5 ALRB No. 33, at pp. 6-7.)

By this rationale, the Board clearly spelled out the reasons why a delayed and "hindsight" approach to determining representation elections should be avoided. (See also, *Domingo Farms, supra,* 5 ALRB No. 35, at pp. 7-8.)

In this case, after a review of preelection data submitted by Ruline, as well as postelection data, the Board concluded the regional director's decision to uphold the election was reasonable. (*Ruline Nursery,* 6 ALRB No. 33, at IHED, p. 26.) The Board based its decision on (1) "the highly speculative nature of the projected peak information";[7] (2) the fact the April 1979 peak payroll was the result of "extraordinary circumstances" not reflective of normal peak and not likely to ever be repeated; and (3) the supposition that the regional director may have considered 1978 to be the "current calendar year." (*Ibid.*)

■ This court has previously stated "The ALRB is the agency entrusted with the enforcement of this Act and its interpretation of the Act is to be accorded 'great respect by the courts and will be followed if not clearly erroneous.'" (*San Diego Nursery Co.* v. *Agricultural Labor Relations Bd.* (1979) 100 Cal.App.3d 128, 140 [160 Cal.Rptr. 822].) The United States Supreme Court is in accord: "We are unprepared to hold that this is an impermissible construction of the Act. '[T]he Board's construction here, while it may not be required by the Act, is at least permissible under it . . .', and in these circumstances its position is entitled to deference. [Citations.]" (*NLRB* v. *Transportation Management Corp.* (1983) 462 U.S. 393, 402-403 [76 L.Ed.2d 667, 676, 103 S.Ct. 2469].)

■ The foregoing reasons and authorities compel this conclusion. The Board's decision to certify UFW as the employees' bargaining representative should be upheld. Even under Ruline's construction of section 1156.4 "current calendar year" language, UFW petition for certification was timely filed.

## III

### *Make-whole Remedy*

Ruline does not dispute its refusal to bargain with the Union. Therefore there has been a clear violation of section 1153, subdivision (e), since as we have found the election was timely, authorized by law.

■ This conclusion precipitates the next question—Did the ALRB correctly impose a make-whole remedy upon Ruline for refusing to bargain with UFW? The standard utilized in determining whether a make-whole

---

[7]In its preelection declarations, Ruline estimated it would need 70 workers in the spring. The IHE noted, however, when spring actually arrived, Ruline engaged in an extraordinary "crash program," that was unlikely to ever be repeated again in the future. (*Ruline Nursery, supra,* 6 ALRB No. 33, at pp. 25-26.)

remedy is appropriate was expressed by the Supreme Court in *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d 1. In *Norton*, the court struck down the Board's policy of ordering a make-whole remedy in all cases in which it found an employer had refused to bargain in good faith. The court stated: "When the integrity of a representation election is being attacked, two competing considerations arise that are both fundamental to the promotion of ALRA policy. The first is the need to discourage frivolous election challenges pursued by employers as a dilatory tactic designed to stifle self-organization by employees. The second is the important interest in fostering judicial review as a check on arbitrary administrative action in cases in which the employer has raised a meritorious objection to an election and the objection has been rejected by the Board. The tension between these two considerations also exists with respect to NLRA policy, which is relevant in this context as a result of the ALRA's provision that applicable NLRA precedents shall govern interpretation of the ALRA. (Lab. Code, § 1148.)" (*Id.*, at p. 30.)

Ultimately, in *Norton,* the Board rule was struck down because it made "no distinction between close cases that raise potentially meritorious objections and frivolous challenges pursued as a tactic for stifling union organization." (*J. R. Norton Co.*, *supra*, 26 Cal.3d 1, 31.)

■ In refusal to bargain cases, the Supreme Court held the Board must "determine from the totality of the employer's conduct whether it went through the motions of contesting the election results as an elaborate pretense to avoid bargaining or whether it litigated in a reasonable good faith belief that the union would not have been freely selected by the employees as their bargaining representative had the election been properly conducted." (*J. R. Norton Co.*, *supra*, 26 Cal.3d 1, 39.)

The court went on to say "our holding does not mean that the Board is deprived of its make-whole power by every colorable claim of a violation of the laboratory conditions of a representation election: *it must appear that the employer reasonably and in good faith believed the violation would have affected the outcome of the election.*" (*Ibid.*, italics added.)[8]

---

[8]Following this language, the Board established this test: "[T]he employer's litigation posture must have been reasonable at the time of the refusal to bargain, and that the *employer* must have acted in good faith. The good-faith aspect requires consideration both of the employer's belief as to the validity of its objection, and of the employer's motive for engaging in the litigation, i.e. whether it 'went through the motions of contesting the election results as an elaborate pretense to avoid bargaining.' (*Ibid.*) [¶] We recognize that an employer may act in good faith, while *not* having a reasonable basis for his position. An employer may also offer a reasonable basis, while not acting in good faith as shown by the totality of the circumstances. We shall consider evidence relevant to those determinations

■ In the present case, the owner of Ruline testified, upon the advice of his attorney, he believed no election could be held in the winter of 1979 because he was not at "peak."

The Board held the 28 employees eligible to vote in the election were over 50 percent of the number of employees employed at Ruline during peak season of the applicable year. The Board found (1) Ruline's litigation posture was not reasonable, and (2) it did not contest the election in good faith; therefore, Ruline was obligated to make its employees whole for losses resulting from its conceded refusal to bargain.

In assessing Ruline's litigation posture, the Board reasoned, given the clear language of the Act, Ruline's proffered statutory construction did not even make out a close case or raise "important issues concerning whether the election was conducted in a manner that truly protected employees' right of free choice." (*J. R. Norton Co., supra,* 26 Cal.3d 1, 39.)

The question posed to this appeal court is: Does substantial evidence support the Board's factual determination that the employer refused to bargain and sought judicial review of UFW certification because it "was motivated by a desire to delay bargaining and to undermine UFW and was not acting in good faith?" (*J. R. Norton Co., supra,* 26 Cal.3d 1, 39; *Ruline Nursery* (1982) 8 ALRB 105.)[9]

As noted above Ruline contended (on advice of attorney) the "current calendar year" means the year in which the petition was filed. This contention was urged in the face of the statutory language "50 percent of the peak agricultural *employment for such employer for the current calendar year for the payroll period immediately preceding the filing of the petition."* (§ 1156.4, italics added.) Ruline's argument for legal colorability relied upon *John J. Elmore, supra,* 3 ALRB No. 63. The detailed discussion above reveals *Elmore* is not on point.

The Board concluded Ruline's argument "bespeaks ingenuity of legalistic argumentation rather than a serious attempt to clarify an otherwise obscure or complex statutory provision." The clear language of the Act and our

which is available at the time of the litigation of the refusal-to-bargain charge. This also is in accordance with the Court's concern that the determination not turn on whether the employer was successful in its claim. Application of this standard will permit this Board to give adequate consideration, on a case-by-case basis, to the concerns raised by the Court in *Norton."* (*J. R. Norton Company* (1980) 6 ALRB No. 26, pp. 3-4.)

[9]Ruline raised 49 objections to the January 10, 1979, representation election. The only one remaining in contest is that Ruline's workforce was not at 50 percent peak when the petition for election was filed.

own analysis of legislative intent support such an observation.[10] We conclude no colorable legal or factual basis existed for overturning the election.

Was the challenge made in good faith? Was the contest an elaborate pretense to avoid bargaining? The Board found Ruline's legal challenge not only to be unreasonable but it was not proffered in good faith. Does substantial evidence support this conclusion?

The Board decisions and orders in *Ruline Nursery* (1982) 8 ALRB No. 8, and *Ruline Nursery Co.* (1981) 7 ALRB No. 21, are sources of much evidence of a continuing antiunion bias by Ruline. In *Ruline Nursery*, 8 ALRB No. 8, the Board found Ruline changed its method of operation from year-round to seasonal, and then discriminatorily laid off pro-UFW employees in order to defeat the unionization of its workforce. This court found substantial evidence supported the Board's finding and no merit in Ruline's petition for hearing in 8 ALRB No. 8 and summarily denied it.

In *Ruline Nursery Co., supra,* 7 ALRB No. 21, the Board overturned the administrative law officer's (ALO) finding Ruline had violated the Act by discharging supervisor Raul Vega in retaliation for his decision to remain neutral rather than to oppose the Union during UFW's organizational campaign at Ruline. However, the Board's decision did not turn on disapproval of the ALO's factual findings; rather, the Board held, as a matter of law, Vega's discharge was not unlawful because under the circumstances there presented, supervisors were not protected by the ALRA.

The Board here also relied on its unfair labor practice findings in the instant case in concluding that Ruline was not challenging the election in good faith. The Board found Ruline made certain unilateral changes in the terms and conditions of employment at the nursery without notice to or bargaining with the Union, and concluded some of those changes were discriminatorily motivated. The Board also found Ruline (1) discriminatorily refused to rehire some Union supporters; (2) discriminatorily delayed the recall of Union adherents; and (3) failed to raise the wages of pro-Union employees reinstated after the issuance of the ALO's decision in *Ruline Nursery, supra,* 8 ALRB No. 8.

---

[10]It is fundamental in statutory construction that the court seek out the Legislature's intent so as to effectuate the purpose of the law. The administrative procedures here reviewed do not alter or amend the statutes or impair their scope. On the contrary these procedures represent a rational attempt to carry out a clear legislative intent in a most complex and multifaceted factual context.

██ ██ In light of Ruline's history of antiunion animus, as well as its actions in the instant case,[11] the Board could reasonably conclude from the totality of Ruline's conduct the nursery did not challenge the Union's certification in good faith. The Supreme Court observed conduct evidencing a desire to eliminate union adherents from employment and an intent to erode union strength is indicative of a desire to engage in "dilatory tactic[s] designed to stifle union organization." (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1, 36.) Substantial evidence supports the Board's determination Ruline did not act in good faith in challenging the election results.

## IV

The Board's order required Ruline to make its employees whole from the date of the refusal to bargain until the nursery "commences" to bargain in good faith.[12]

Thus, the make-whole obligation runs only until Ruline begins to bargain in good faith. The Board has defined good faith bargaining as such bargaining as leads to either contract or a bona fide impasse. Such an order does not compel the employer to make concessions to the Union at the bargaining table. Nor does it continue the make-whole order after commencement of bargaining in good faith. It was not an open-ended order.

## V

### Unilateral Changes

The Board found Ruline, after UFW had been certified as the bargaining representative of its employees, had made three unilateral changes in the terms and conditions of employment in violation of section 1153, subdivi-

---

[11]In determining whether an employer had a good faith doubt as to the validity of a union's majority status when it refused to bargain, the federal board will consider the totality of the employer's conduct contemporaneous with the refusal to bargain. (*Joy Silk Mills* v. *National Labor Relations Board* (D.C. Cir. 1950) 185 F.2d 732, cert. den. 341 U.S. 914 [95 L.Ed. 1350, 71 S.Ct. 734].) (See also, *Montebello Rose Co.* v. *Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1 [173 Cal.Rptr. 856]; *As-H-Ne Farms, Inc.* (1980) 6 ALRB No. 9; *Heck's Inc.* (1968) 172 NLRB 2231, affd. (D.C. Cir. 1970) 433 F.2d 541.)

[12]The Board's order specifically provides Ruline should make whole all of its present and former agricultural employees for all losses of pay and other economic losses suffered by them as a result of its failure and refusal to bargain in good faith with UFW and the period of said obligation to extend from July 31, 1980, *until the date on which respondent commences good faith bargaining with the UFW which results in either a contract or a bona fide impasse.*

264

sion (e). The changes involved elimination of holiday and vacation pay, a reduction of daily working hours and an increase in wages.[13]

■ An employer's unilateral changes in terms and conditions of employment when it is under a duty to bargain in good faith are "per se" refusals to bargain and, thus, violate section 1153, subdivisions (a) and (e). Such changes are "a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) [§ 1153, subd. (e)] much as does a flat refusal [to bargain]." (*N.L.R.B.* v. *Katz* (1962) 369 U.S. 736, 743 [8 L.Ed.2d 230, 236, 82 S.Ct. 1107].)

The ALRB has expressly adopted the *Katz* rationale. "While we generally probe conduct for evidence of the presence or absence of subjective 'good faith,' some types of conduct, even when viewed independently, constitute *per se* violations of the duty to bargain, without regard to good or bad faith. Morris, *The Developing Labor Law,* p. 322. Such conduct, in addition to constituting an independent violation, acts to support an inference of bad faith. *Ibid.,* p. 323. Thus, where an employer institutes unilateral changes in working conditions during the course of negotiations, it violates the duty to bargain. *NLRB* v. *Katz,* 369 U.S. 736; . . ." (*O. P. Murphy Produce Co., Inc.* (1979) 5 ALRB No. 63, at p. 12.)

■ The company contends all three changes were made more than six months before the charges were filed and therefore the charges are barred by the six-month statute of limitations.

Section 1160.2 provides, in relevant part: "No complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the board." Section 10(b) of the National Labor Relations Act is identical to section 1160.2. Section 10(b) has been consistently held to bar the filing of the charges based upon acts which occurred over six months from the time the charging party knew or should have known of the act upon which the charge is based. (*Montebello Rose Co.* v. *Agricultural Labor Relations Bd., supra,* 119 Cal.App.3d 1, 30.)

The charges were filed almost a year after these unilateral changes first occurred. ■ However, the running of the statute of limitations is tolled where the charging party has no "actual or constructive notice of the un-

---

[13]Ruline admits in January 1980 it made the following unilateral changes in terms and conditions of employment without prior notifications or discussion with UFW: (1) reduced length of the normal work day for paid employees from nine hours to eight hours; (2) raised wages of its hourly paid employees; and (3) eliminated holiday pay and vacation pay for hourly employees.

lawful conduct in refusal to bargain cases dealing with unlawful unilateral changes." (*S & W Motor Lines, Inc.* (1978) 236 NLRB No. 113.)

■ Further, section 1160.2 is an affirmative defense. The employer "has the burden to establish that the unions had actual or constructive notice." (*AMCAR Division* v. *N.L.R.B.* (8th Cir. 1979) 596 F.2d 1344, 1351.) Ruline's contention "the party whose state of mind is at issue must have the burden of proof" is in direct conflict with established case law.

■ Substantial evidence establishes neither the charging party, Pedro Rivas, nor UFW had actual or constructive notice of Ruline's unilateral shortening of the work day until October 6, 1980. On that day Pedro Rivas returned to work for Ruline for the first time that year.[14] One month later he filed unfair labor charges regarding Ruline's unilateral change in the work day. Since section 1160.2 was tolled until October 6, 1980, Rivas filed the unfair labor charges well within the six-month limitation.

Ruline asserts "other 'aggrieved parties' were subject to the January 1980, reduction in hours as early as January 1980." Ruline has produced no "other aggrieved parties" to substantiate this claim.

UFW, not other employees, is the "other aggrieved party." There is no evidence in this record to show UFW received either constructive or actual notice of this unilateral change. Therefore, there is no evidence UFW knew, or reasonably should have known, of the unlawful unilateral change. (*Bruce Church, Inc.* (1979) 5 ALRB No. 45, at p. 7.)

On the contrary, substantial record evidence establishes UFW, the charging party, did not have actual or constructive notice of Ruline's unilateral increase in hourly employees' wages until December 2, 1980. On that day UFW filed an unfair labor charge alleging the unilateral change in terms and conditions of employment without prior notice to or an offer to bargain with its employees' exclusive bargaining representative. Ruline presented no evidence demonstrating its conduct did or could have come to UFW's attention six months before it filed an unfair labor charge.

---

[14]Ruline failed to produce any evidence at the hearing that Pedro Rivas had worked at Ruline before October 6, 1980. Ruline's employee work and seniority list shows Rivas did not work in July, August or September 1980. Ruline's attempt to mischaracterize Rivas' testimony on this point does not withstand scrutiny. Rivas' testimony clearly demonstrates he learned of the unilateral change when he first returned to work in 1980. Although Rivas could not recall the date he first returned to work that year, there is no evidence in the record demonstrating a return to work prior to October 6, 1980.

The NLRB in *Crown Cork & Seal Co., Inc.* (1980) 253 NLRB No. 4, held the six-month limitations period does not bar finding that an employer violated the Act where the employer failed to show its unlawful conduct did or could have come to the notice of the union more than six months before the unfair labor practice was filed. (*Ibid.;* see also *Plymouth Locomotive Works, Inc.* (1982) 261 NLRB No. 87.)

Ruline's violation consisted of its refusal "to bargain collectively in good faith with labor organizations [UFW] certified pursuant to the provisions of [the Act]." (Lab. Code, § 1153, subd. (e).) Moreover, "[f]or purposes of [the Act] to bargain collectively in good faith is the performance of the *mutual* obligation of the agricultural employer and *the representative* of the agricultural employees . . . ." (§ 1155.2, subd. (a), italics added.) *The bargaining obligation runs from the employer to the certified union. The employer's duty to bargain with the union is exclusive.* (Lab. Code, § 1156.) An employer, for example, who deals directly with bargaining unit employees rather than with their exclusive representative violates the Act. The bargaining obligation being exclusive (see § 9(a) of the Act, 29 U.S.C. § 159(a), Lab. Code, § 1156) exacts the negative duty to treat with no other.

During January 1980, Ruline unilaterally terminated its policy of paying holiday and vacation pay to its hourly employees. Ruline did not notify or offer to bargain with UFW regarding those changes in terms and conditions of employment. However, Pedro Rivas learned about this prospective change in December 1979. He did not file unfair labor charges against Ruline until November 6, 1980. Ruline continued these unilaterally changed conditions throughout the six-month period prior to November 6, 1980.

Failure to pay vacations and holidays during that period constitutes *a continuing* violation of the Act. "The issue is not simply whether Respondent committed an unfair labor practice by initiating the policy, but whether it violated the Act by maintaining and giving effect to that policy." (*Julius Goldman's Egg City,* 6 ALRB No. 61, at p. 5; *Machinists Local* v. *Labor Board* (1960) 362 U.S. 411, 416 [4 L.Ed.2d 832, 837-838, 80 S.Ct. 822].)

The Board did not hold Ruline accountable for its failure to pay vacation and holiday pay to its hourly employees prior to six months before a charge was filed. Rather, it was Ruline's refusal to continue its past practice of paying its hourly paid employees vacation and holiday pay within the six months prior to November 6, 1980 (the limitations period). Does this failure constitute an independent violation of the Act? Ruline did not pay its employees holiday pay for Memorial Day, July 4 and Labor Day in 1980—

holidays within the limitations period—as it had in 1979. Furthermore, no hourly paid employees received vacation pay within the limitations period. Such refusal to pay holiday and vacation pay are independent violations of the Act which occurred within the limitations period.

Substantial record evidence, therefore, supports the Board's conclusion Ruline violated section 1153, subdivisions (a) and (e) when it unilaterally changed its hourly employee's terms and conditions of employment without prior notice to or discussion with UFW.

## VI

### *Discriminatory Acts*

The Board found Ruline had violated section 1153, subdivisions (a) and (c), by failing to rehire Pedro Rivas and Guadalupe Ruiz in July and August 1980, failing to rehire Agustin Madrid and Miguel Pereda in November 1980, failing to rehire Agustin Madrid in December 1980, failing to give six employees the raise it had given other workers in January 1980 and eliminating paid holidays and vacations. The Board found these acts were accomplished with an antiunion discriminatory intent.

Failure to rehire Madrid and Pereda in November 1980 and failure to give the six employees the wage raise were never made the subject of separate unfair labor practice charges nor included in the initial complaint. Rather, the ALO allowed them to be amended into the complaint during trial. An unfair labor practice complaint can be amended during the hearing. (See Lab. Code, § 1160.2.) ▬ Ruline contends the amendments were faulty because they did not clearly relate to an existing timely filed charge.

Ruline contends the statute of limitations had run on each of these alleged violations before the complaint was amended to include those allegations. The original charges which the Board found to be related to the amendment were timely filed in August 1980. The Board there alleged a refusal to bargain and the company "has waged an anti-union campaign, through layoffs, discharges and warnings" since November 1978. At trial, the ALO permitted general counsel to amend the complaint to allege discriminatory delays in rehiring which occurred in November 1980 and failure to give wage raises to employees which occurred in October or November 1980.

Ruline contends the amendments were faulty because they did not clearly relate in time and nature to events for which charges had been filed. The hearing officer and the Board found they did so relate.

While Ruline contends the amendment must clearly relate *in time* to a charged act, the authorities it cites do not so hold. The Supreme Court in *Labor Board* v. *Fant Milling Co.* (1959) 360 U.S. 301 [3 L.Ed.2d 1243, 79 S.Ct. 1179], indicates the timeliness requirement, if there is one, was met in the present case. In *Fant,* a refusal to bargain was charged. A later amendment to a complaint alleging a unilateral wage increase five months after the charge had been filed was permitted. "Once the Board's jurisdiction has been invoked by the filing of a charge, its General Counsel is free to make full inquiry under its broad investigatory power in order to properly discharge its duty of protecting public rights. *NLRB* v. *Fant Milling Co.* (1959) 360 U.S. 301 . . . .

Where, as here, the charge and the original complaint include an alleged violation of section 1153(a), the complaint may be amended to include additional violations of section 1153(a), so long as the parties receive adequate notice of the new allegations. (See *NLRB* v. *Raymond Pearson, Inc.* (5th Cir. 1957) 243 F.2d 456 . . . ." (*Porter Berry Farms,* 7 ALRB No. 1, p. 2.) In the present case, the ALO permitted an amendment charging a violation which occurred two to three months after the charge had been filed.

Did the amendment insufficiently relate in nature to the charged offense? The original charge alleged a pattern of antiunion conduct, describing three kinds. The acts complained of in the amendment fall within the same pattern but were additional varieties. Since Ruline was charged in the original complaint with violations of section 1153, subdivisions (a), (c) and (d), and was given adequate opportunity to defend against the new allegations, the amendments were proper.

"Actions before the Board are not subject to the technical pleading, requirements of a private lawsuit. [Citation.] The charge need not be technically precise so long as it generally informs the party charged of the nature of the alleged violations . . . ." (*N.L.R.B.* v. *Carilli* (9th Cir. 1981) 648 F.2d 1206, 1210.) The real question here is whether Ruline was deprived of due process or was in any way prejudiced by the amendments. ▊ A party can be prejudiced by an amendment if it had destroyed evidence which subsequently became important because of the amendment or it did not have a witness present which would have testified had the charge been initially accurate. ▊ Ruline has made no such contention(s) in the present case and never asked for a continuance to meet the amendment. The amendments were proper.

▊ Substantial evidence supports the Board's finding Ruline violated section 1153, subdivisions (a), (c) and (d) when it refused to rehire Pedro Rivas and Guadalupe Ruiz.

Ruline does not dispute the fact it knew Pedro Rivas and Guadalupe Ruiz had engaged in protected union activities and that they had participated in the Board's processes. The issue, therefore, is whether Ruline had violated section 1153, subdivisions (a), (c) and (d) when it refused to rehire Rivas and Ruiz. Substantial record evidence demonstrates Rivas and Ruiz were well qualified and experienced as Ruline employees when they sought work at Ruline on July 22, 1980, and August 13, 1980. Substantial record evidence shows between July 22 and August 12, 1980, and between August 13 and August 29, 1980, 13 new positions were available at Ruline. Finally, Ruline Supervisor Luz Escobedo testified many of the new and inexperienced employees hired during the aforementioned periods were hired on dates later than the dates when they actually sought work. Escobedo contacted these new employees by telephone or by sending word.

Despite the availability of work, their past experience, their expressed interest in returning to Ruline, neither Rivas nor Ruiz was recalled. Rivas and Ruiz were eventually recalled on September 29, 1980, but only to toll Ruline's backpay liability. Substantial evidence supports the conclusion Ruline refused to recall Rivas and Ruiz because of their well-known UFW sympathies and for their use of the ALRB's processes.

Ruline contends substantial record evidence does not support the Board's finding Ruline violated section 1153, subdivisions (a), (c) and (d), when it withheld wage increases for Guadalupe Ruiz, Pedro Rivas, Elias Gonzalez, Miguel Pereda, Juana de Varela, and Agustin Madrid.

The facts are undisputed on January 1, 1980, Ruline raised the wages of all employees. On that date Guadalupe Ruiz, Pedro Rivas, Elias Gonzalez, Miguel Pereda, Juana de Varela, and Agustin Madrid were on layoff status. When the six discriminatees returned to work in October 1980, they were paid at the same rate they were earning in the summer of 1979. Ruline's explanation for not raising their wages was the six were not employed on January 1, 1980.[15]

Ruline justifies its actions on the grounds three other Union supporters received wage increases in January 1980. The fact an employer does not

---

[15]Ruline's claim must be examined, as did the Board, in this context: (1) all six discriminatees were well known UFW supporters who had participated in the ALRB processes; (2) all six were on layoff status on January 1, 1980, because of Ruline's discriminatory conversion from permanent, full-time work to temporary, seasonal work; (3) all six were recalled to work in September 1980 because the ALO in *Ruline Nursery, supra,* 8 ALRB No. 8 had just ordered Ruline to rehire them; (4) Ruline's failure to raise their wages is in direct conflict with Ruline owner Rufus Orson's professed "intent to be fair across the board and to increase everyone's wage."

discriminate against *all* union supporters, does not prove the employer did not discriminate against some union supporters. "The mere fact that other known union adherents were not laid off or discharged does not disprove or preclude a finding of violation of the Act as to those incidents charged. [Citations.]" (*Tex-Cal Land Management, Inc.* (1977) 3 ALRB No. 14, at p. 3.) Finally, the timing of the withholding of wage increases is further evidence of Ruline's antiunion animus. (*N.L.R.B.* v. *American Geri-Care, Inc.* (2d Cir. 1982) 697 F.2d 56.)

Based upon the above facts, the Board correctly found Ruline violated section 1153, subdivisions (a), (c) and (d) when it withheld wage increases from the six discriminatees. Substantial record evidence supports the Board's finding Ruline violated section 1153, subdivisions (a), (c) and (d) when it withheld wage increases from the six discriminatees.

■ Ruline does not dispute it delayed rehiring Miguel Pereda and Agustin Madrid in favor of four male employees who had less seniority than Pereda or Madrid. Ruline admits it deviated from its "seniority-based recall layoff policy."

Ruline attempts to direct this court's attention from its "inadvertent deviation" by claiming there is no evidence of antiunion animus. It is true in *Ruline Nursery Co., supra,* 7 ALRB No. 21, the Board reversed the ALO's decision regarding the discharge of Supervisor Raul Vega. The ALRB later explained that holding: "As a matter of law the discharge of a supervisor constitutes an unfair labor practice only in special circumstances, which were not present in that case." (*Ruline Nursery, supra,* 8 ALRB No. 105, pp. 5-6.) The Board, however, affirmed the ALO's conclusion: "Uncontradicted testimony established widespread employee knowledge of Vega's earlier involvement in the discharge of pro-union workers, his neutrality in current organizing efforts, company hostility to him following a resurgence in union activity, and a reasonable belief that his discharge was motivated by anti-union animus." (*Ruline Nursery Co., supra,* 7 ALRB No. 21, ALOD:43.)

Moreover, the overwhelming evidence of Ruline's antiunion activities and animus is fully reviewed in *Ruline Nursery, supra,* 8 ALRB No. 105 (hg. den. by this court), 4 Civ. No. 26724.

Substantial record evidence supports the Board's finding Miguel Pereda and Agustin Madrid would have been recalled earlier but for Ruline's antiunion animus. Ruline's "inadvertence," therefore, is no explanation for its deviation from its claimed policy.

The facts are undisputed between December 6 and 11, 1980, Agustin Madrid was unable to return to work at Ruline due to his deportation from the United States by the Border Patrol. On December 12, after missing five days of work, he returned to Ruline seeking reinstatement.

The ALO credited Madrid's testimony that at the time Madrid requested reinstatement he explained to Supervisors Escobedo and Jester he was unable to give prior notice because he was alone and without funds when he was arrested by the Border Patrol. Escobedo and Jester ignored this explanation and told him there was no more work for him.

Ruline here asserts Madrid was discharged for missing work for three consecutive days without "prior" notification in violation of company policy; substantial record evidence establishes Ruline reinstated employees who had been deported *if they explained their situation upon seeking reinstatement.* Ruline, however, did not follow its past practice of listening to an employee's excuse for not giving prior notice in Madrid's case. This rejection must be viewed in this factual context. Three months before Ruline's refusal to hire Madrid, it was forced by the ALRB to do so, it had previously withheld a wage increase from Madrid and it had delayed rehiring him.

Ruline's unlawful motivation in rejecting Madrid's reapplication was further evidenced by the fact that at the time Madrid was rejected, Ruline was in need of employees due to the heavy pre-Christmas shipping period. Instead of employing Madrid, even as a "new" employee, Ruline chose two new and inexperienced employees. Substantial evidence supports the conclusion Ruline was seeking to rid itself of a known UFW supporter.

Although the ALO found "other reasons for the discharge may exist," the ALO made it clear Madrid's discharge was motivated by Ruline's antiunion animus. (8 ALRB No. 105, p. 59.) In other words, but for Ruline's antiunion animus, Madrid would not have been discharged. (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 729 [175 Cal.Rptr. 626, 631 P.2d 60].)

Substantial record evidence supports the Board's finding Ruline violated Labor Code section 1153, subdivisions (a), (c) and (d) when it discharged and refused to rehire Madrid due to his protected union activities and recourse to the Board.

The orders of the Board are affirmed.

Brown (Gerald), P. J., and Wiener, J., concurred.

A petition for a rehearing was denied June 26, 1985, and petitioner's application for review by the Supreme Court was denied August 29, 1985. Bird, C. J., did not participate therein.