[No. H010901. Sixth Dist. Jan. 4, 1994.]

SCHEID VINEYARDS AND MANAGEMENT COMPANY, Petitioner, v. AGRICULTURAL LABOR RELATIONS BOARD, Respondent; UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party in Interest.

**COUNSEL**

Littler, Mendelson, Fastiff, Tichy & Mathiason and Randolph C. Roeder for Petitioner.

J. Antonio Barbosa, Susan P. Underwood and Julie Demaris for Respondent.

Marcos Camacho for Real Party in Interest.

**OPINION**

**COTTLE, P. J.**—Scheid Vineyards and Management Company (Scheid) seeks review of the decision and order of the Agricultural Labor Relations

Board (ALRB) in this technical refusal to bargain case. ALRB found that Scheid committed an unfair labor practice in violation of Labor Code section 1153, subdivision (e) by refusing to bargain with the United Farm Workers of America, AFL-CIO (UFW), which had been properly certified in a 1992 election as the representative of Scheid's agricultural employees. The ALRB ordered Scheid to meet and bargain in good faith with the UFW and to make its employees whole for economic losses resulting from Scheid's failure to bargain. The following issues are presented by Scheid's petition for review: (1) whether ALRB's regional director failed to comply with the requirements of Labor Code section 1156.4; (2) whether Scheid made a prima facie showing in its petition objecting to the election, which would have required the ALRB to grant Scheid a hearing; and (3) whether any of Scheid's arguments present "novel legal theories" which would make application of the makewhole remedy inappropriate?

*Summary of Facts*

On February 19, 1992, the UFW filed a representation petition on Scheid. The petition alleged, inter alia, that "the number of agricultural employees currently employed by [Scheid] is not less than fifty percent of his peak agricultural employment for the current calendar year" and that the "approximate number of employees currently employed in the unit" is 120.

Under ALRB regulations, Scheid was required to submit a response to the petition within 48 hours. (Cal. Code Regs., tit 8, § 20310.) The response, signed under penalty of perjury by the late Andrew Church, a prominent labor law attorney, indicated "the employer agree[s] that the number of employees employed in the payroll period immediately preceding the filing of the Petition for Certification is at least 50 percent of the employer's peak employment for the calendar year."

At the top of the response form, Scheid was advised that the requirements for its response were set out in California Code of Regulations, title 8, section 20310. Scheid was then asked to answer various questions on the response form and to provide certain documentation in support of its answers. One question asked Scheid how many employees were employed in the payroll period immediately preceding the filing of the petition. Scheid answered "121." To support this answer, Scheid was asked to "Attach a copy of the employer's original payroll records which show the names of employees employed each day during the payroll period." According to Scheid's general manager, Kurt Gollnick, Scheid submitted an "Employee Master List" "Week Ending 02-16-92," listing 150 individuals. Later, when

Scheid objected to the election, Gollnick claimed some of these individuals were not agricultural workers. However, the cited-to ALRB regulations directed the employer to provide *only* the names of agricultural workers. Specifically, California Code of Regulations, title 8, section 20310, subdivision (a)(2) states that the employer shall provide: "A complete and accurate list of the complete and full names, current street addresses, and job classifications of all *agricultural* employees, including employees hired through a labor contractor . . . ." (Italics added.) In addition to submitting this master list of employees, Scheid also submitted a computer time card summary for the week ending February 16, 1992. The summary listed 132 names. Scheid did not explain the discrepancy between the payroll time card summary and the master list.

Next Scheid was asked for "the dates of the payroll period which the employer contends was or will be its peak payroll period for the calendar year [1992]." Scheid indicated it expected to reach its "peak payroll period" on October 11, 1992, when it would employ 250 agricultural workers. The form then advised Scheid, "If the employer contends that the payroll period of peak employment in the calendar year will occur later in the calendar year, ATTACH payroll records from prior years, crop and acreage information, and any other information which supports that contention." Gollnick stated in his declaration that he submitted a computer time card summary for the week ending October 6, 1991, showing the peak number of employees employed in 1991 was 226. (Of these 226, Gollnick stated that only 216 were agricultural workers.) Gollnick did not specifically state that Scheid submitted crop and acreage information, but we may assume that it did as this was required. ▪ As the court stated in *Ruline Nursery Co.* v. *Agricultural Labor Relations Bd.* (1985) 169 Cal.App.3d 247 [216 Cal.Rptr. 162], an "employer must provide the Board with certain information, including a statement, based on evidence available to the employer, of the highest single payroll period of employment during the preceding year, and a statement of the acreage devoted to each crop during the calendar year. [Citation.] The employer's failure to provide this information may give rise to a presumption the petition is timely filed with respect to the employer's peak season. ([Cal. Code Regs.], tit. 8, § 20310, subd. (e)(1).)" (*Id.* at p. 257.)[1] In any event, the ALRB agent in charge of the election "did not at any time ask [Gollnick] about our peak employment, our acreage or our crop statistics, the differences between the Preelection Payroll and the Master List, or the

---

[1]California Code of Regulations, title 8, section 20310, subdivision (e)(1) provides: "If an employer fails to comply with the requirements of subsections (a) through (d) above, and such failure frustrates the determination of particular facts, the regional director may invoke any or all of the following presumptions: . . . (B) That the petition is timely filed with respect to the employer's peak of season."

prospective peak employment that we stated in our Response" during any of the three telephone conferences he held with Gollnick before the election or in the required preelection conference.

The election was held on February 26, 1992. All 150 individuals named on Scheid's "Master List" of employees appeared to vote, as did 6 other individuals. The ALRB challenged the six who did not appear on the list, and the UFW challenged nineteen others who had some sort of special relationship with the employer. (Cal. Code Regs., tit. 8, § 20355 sets forth the criteria for challenging the eligibility of a person to cast a ballot.) Scheid did not challenge any of the individuals although it could have done so if any prospective voter was "not employed in the appropriate unit during the applicable payroll period." (Cal. Code Regs., tit. 8, § 20355, subd. (a)(2).) It therefore appears that up to and including the time of the election, Scheid continued to concede it had at least 131 agricultural workers which made up more than 50 percent of its anticipated peak employment for the year. UFW won the election, garnering 87 of the 131 votes.

On March 4, 1992, seven days after the election, Scheid filed an objection, claiming the election was held when employment was at less than 50 percent of peak for the calendar year. In support of the objection, Scheid submitted Gollnick's declaration, parts of which have been discussed, *ante*. In the other parts of the declaration, Gollnick stated that Scheid contracted in December 1991 to manage an extra 900 net vine acres in the Paicines area. This commitment would result in a 40 percent increase in the number of vine acres to be harvested in 1992 as compared with 1991. Gollnick also stated that Scheid began "prepar[ing] a budget . . . encompassing labor expense" relating to the Paicines acreage on January 6, 1992, some six weeks before UFW's petition was filed and some seven weeks before the election. He further stated that Scheid had "agreed on a final budget only about a week before the Representation Petition was filed." However, because Scheid had not "completed [its] planning for the vineyard" by the time the response was due, it underestimated its 1992 peak, which it now estimated would be 358. Gollnick explained that the Master List of 150 names did not indicate "whether the employees were engaged in agricultural work, or whether they worked in the payroll period immediately preceding the election." As to the computer time card summary for the payroll period immediately preceding the election, Gollnick explained that 11 of the 132 individuals were office employees, shop employees and foremen on the payroll.

Scheid's objection was denied by the executive secretary of the ALRB without a hearing. Scheid then asked for a rehearing, which was also denied.

In the meantime the UFW appeared to begin collective bargaining. Scheid refused to do so, claiming it first had to resolve the important legal issue of whether the election was held at a time when fewer than 50 percent of the employer's peak employment for the calendar year were employed.

*Issues*

1. Did the regional director of the ALRB fail to comply with the requirements of Labor Code section 1156.4 in examining peak and fail to make a full and complete investigation into peak once the issue was raised?

2. Did Scheid make a prima facie showing sufficient to require a hearing on its objection?

3. Did any of Scheid's arguments present "novel legal issues" which would make application of the makewhole remedy inappropriate?

*Analysis*

Labor Code section 1156.4 provides: "Recognizing that agriculture is a seasonal occupation for a majority of agricultural employees, and wishing to provide the fullest scope for employees' enjoyment of the rights included in this part, *the board shall not consider a representation petition or a petition to decertify as timely filed unless the employer's payroll reflects 50 percent of the peak agricultural employment for such employer for the current calendar year* for the payroll period immediately preceding the filing of the petition. [¶] In this connection, *the peak agricultural employment for the prior season shall alone not be a basis for such determination, but rather the board shall estimate peak employment on the basis of acreage and crop statistics which shall be applied uniformly throughout the State of California and upon all other relevant data.*" (Italics added.)

Focusing first on the first paragraph of section 1156.4, Scheid argues the board was "statutorily barred" from considering a representation petition because Gollnick provided evidence after the election that Scheid was not at 50 percent of peak in the payroll period preceding the filing of the petition. Then focusing on the second paragraph, Scheid contends the board failed to fully investigate peak (specifically that it failed to take into consideration acreage and crop statistics).

On review of a regional director's decision to hold an election in a "prospective peak" case (one in which the peak for the year has not yet occurred), the standard of review is " 'whether the regional director's peak

determination was a reasonable one in light of the information available at the time of the investigation.' [Citations.]" (*Ruline Nursery Co.* v. *Agricultural Labor Relations Bd., supra*, 169 Cal.App.3d at p. 258.) As the *Ruline* court pointed out, "to use postelection data as the basis for review of reasonableness in prospective peak cases would run contrary to the Act's policy of placing a 'premium on speed and finality in deciding the results of elections.' [Citation.]" (*Ibid.*)

Applying this standard to the instant case, it is clear the regional director's decision was reasonable *when made*. The information the regional director had was as follows: (1) 1991's peak was 226 ("[P]ayroll records for prior years are the most important single factor in estimating peak employment for a current year. Such records provide a standard for comparison." [*Wine World, Inc.* v. *United Farm Workers* (1979) 5 ALRB No. 41, p. 6.]); (2) 1992's expected peak, according to Scheid, would be higher—250 (Assuming Scheid supplied acreage and crop statistics *as it was required to do on the employer's response form*, the regional director reasonably could have accepted Scheid's proffered peak estimate of 250 rather than estimating peak based on what it was in 1991. This was because acreage information would show that Scheid had more vineyards to harvest in 1992 than it did in 1991. As noted, Labor Code section 1156.4 states that "the peak agricultural employment for the prior season shall *alone* not be a basis for such determination, but rather the board shall estimate peak employment on the basis of acreage and crop statistics which shall be applied uniformly throughout the State of California and upon all other relevant data." [Italics added.] If, on the other hand, Scheid did not supply the required information, the presumption will be made: "That the petition is timely filed with respect to the employer's peak of season." [Cal. Code Regs., tit. 8, § 20310, subd. (e)(1)(B); *Ruline Nursery Co.* v. *Agricultural Labor Relations Bd., supra*, 169 Cal.App.3d at p. 258.]); (3) Scheid conceded in its response that the number of employees employed during the prepetition payroll period was at least 50 percent of its peak employment for the calendar year and it never advised the regional director otherwise in any of its preelection conferences; (4) ALRB regulations require an employer to submit only the names of agricultural employees; (5) Scheid submitted a master list of 150 employees and a payroll time card listing 132 employees; (6) by analogy to the "best evidence rule," the master list, including name, address, and other information relating to each employee, and the payroll records, again presumably naming individual employees, were more reliable than the typewritten response to the question asking for the number of employees employed in the prepetition payroll, which Scheid answered, "121." Any reasonable investigation of the number of employees would give more weight to the lists naming each

individual employee. An employer could intentionally or inadvertently leave off some names, but it is hard to imagine an employer making up names and addresses for its employee list. The master list was clearly the most accurate list available to the regional director when he made his investigation into peak. Its accuracy was borne out at the election when all the named employees appeared to vote.

Also pertinent to the regional director's decision was the fact that Scheid never even suggested that peak was an issue. Gollnick acknowledges three different telephone conversations with the regional director concerning the upcoming election. He also acknowledges attending the required preelection hearing with the regional director.

In summary, at the time of his investigation, the regional director had the following information: Scheid's peak employment for 1992 would be in the vicinity of 226 to 250; during the week before the petition was filed, Scheid employed somewhere between 132 and 150 agricultural employees; and Scheid and the experienced labor law attorney who filled out Scheid's response form agreed that the number of employees on Scheid's prepetition payroll was more than 50 percent of its peak employment for the year. Numerous ALRB decisions have held that the ALRB is entitled "to rely on the accuracy of statements or payroll records submitted to them by the Employer." (*Kubota Nurseries* (1989) 15 ALRB No. 12, p. 11; *Tepusquet Vineyards* (1984) 10 ALRB No. 29.) Under these circumstances, there was no further information the regional director needed in order to determine that the peak requirement was met.

Scheid's reliance on *Tepusquet Vineyards, supra,* and *Kamimoto Farms* (1981) 7 ALRB No. 45, for the proposition that the regional director had a duty to investigate further, is misplaced. The employers in both of those cases asserted initially in their responses to the petition, and repeatedly thereafter in the preelection period, that they were not at 50 percent of peak for the year. In *Tepusquet,* the employer provided peak information for the prior two years. For 1981, the employer erroneously claimed it employed 59 workers at its peak employment period (the employer actually employed 81 workers at its 1981 peak), and for 1982, the employer claimed it employed 110. Twenty-one of the 1982 workers hired to pick end-rows over a 2-day period were determined to be "unusual and not likely to occur in 1983." The regional director then compared the 89 remaining with the 59 from the year earlier and determined that 59 was the likely peak for 1983. Throughout this period, the employer was protesting and called the regional director to advise

her that in years prior to 1981 over 80 employees had also been employed at peak. The regional director held the election nevertheless, and the ALRB set it aside.

Similarly, in *Kamimoto Farms, supra*, the employer's response stated that 40 workers were working during the payroll period preceding the filing of the petition, 70 were expected to be employed during peak, and that the employer's work force during the eligibility period was less than 50 percent of the work force at the peak period. (The employer had intended to respond that at peak it would hire 70 *additional* workers.) The "[e]mployer had asked several times [in the preelection period] for the basis of the Board agent's determination that the petition was timely filed because the number of employees in the eligibility period exceeded 50 percent of the number to be employed in the peak period." (7 ALRB No. 45, pp. 1-2.) The ALRB held that the regional director had a further duty to inquire under these circumstances. In the instant case, in contrast, the employer at all times agreed with the determination that it was at more than 50 percent of peak in the prepetition payroll period.

The next issue is whether Scheid made a prima facie showing in its election objection, which would have entitled Scheid to a hearing on its peak complaint. As noted, the executive secretary dismissed Scheid's objection without a hearing. Labor Code section 1156.3, subdivision (c), provides: "Within five days after an election, any person may file with the board a signed petition . . . objecting to the conduct of the election or conduct affecting the results of the election. [¶] Upon receipt of a petition under this subdivision, the board, upon due notice, *shall conduct a hearing* to determine whether the election shall be certified." (Italics added.)

Despite the seemingly mandatory language of Labor Code section 1156.3, the California Supreme Court has ruled that a hearing is required only where the objecting party has established a prima facie case for setting aside the election. (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 9 [160 Cal.Rptr. 710, 603 P.2d 1306].) The question is therefore whether Gollnick's declaration established a prima facie case that the regional director's peak analysis was not a "reasonable one in light of the information available at the time of the investigation." (*Charles Malovich* (1979) 5 ALRB No. 33, p. 4.) As we have discussed previously, Scheid did not make this showing. All the information Scheid provided supported the regional director's determination.

■ Scheid's final argument is that the "makewhole" remedy[2] was inappropriate because this was a "close case" involving "novel legal theories." The ALRB responded that Scheid was merely using "stalling tactics" and, therefore, this was an appropriate case for imposing the makewhole remedy.

In *J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1, the Supreme Court set forth the following standard for determining when makewhole is appropriate: "[T]he Board must determine from the totality of the employer's conduct whether it went through the motions of contesting the election results as an elaborate pretense to avoid bargaining or whether it litigated in a reasonable good faith belief that the union would not have been freely selected by the employees as their bargaining representative had the election been properly conducted." (*Id.,* at p. 39.)

The court shed further light on the appropriate standard in *George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1985) 40 Cal.3d 654 [221 Cal.Rptr. 488, 710 P.2d 288]. There, the court explained that the reasonableness of an employer's litigation posture can be determined by "an objective evaluation of the claims in the light of legal precedent, common sense, and standards of judicial review, and the board must look to the nature of the objections, its own prior substantive rulings and appellate court decisions on the issues of substance. Pertinent too, are the size of the election, the extent of the voter turnout, and the margin of victory." (*Id.* at pp. 664-665.)

"It is the Board's policy not to award make whole in situations involving novel legal theories *or* in close cases that raise important issues concerning whether an election was conducted in a way that protected the employees' right of free choice." (*In re San Justo Ranch/Wrick Farms* (1988) 14 ALRB No. 1, pp. 7-8, italics added.)

Scheid contends its legal position throughout has been reasonable because "there is no evidence of any investigation by the Salinas regional office into peak employment" and because "it has been established that Scheid Vineyards was well below 50 percent of its peak employment when the election was held." However, both of these contentions are incorrect.

First, there is a great deal of evidence that an investigation into peak was made. Voluminous information was provided the regional director in UFW's

---

[2]The ALRB is authorized by statute to "mak[e] employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain . . . ." (Lab. Code, § 1160.3.) "It is clear that make-whole relief is appropriate when an employer refuses to bargain for the purpose of delaying the collective bargaining process." (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d at p. 31.)

petition, in Scheid's response, and in the documents Scheid was required to attach to its response. Scheid's employee "Master List," its payroll time cards for the February 16, 1992, pay period and its payroll time cards for the 1991 peak pay period were provided. In addition to that, the regional director had at least three phone conversations with Scheid, and he held a preelection hearing to obtain any additional pertinent information. Thus, Scheid's contention that there was no investigation into peak is frivolous.

*Second*, it was not "established" that Scheid was below 50 percent of its peak employment in the prepetition pay period. Although Scheid ultimately hired 364 agricultural workers during its 1992 peak (the week ending September 20, 1992),[3] that fact is not relevant to the determinitive issue in this petition for review—namely, whether the regional director's determination was reasonable when made. Nor is that evidence reliable. As the court explained in *Ruline*, ". . . to use postelection data as the basis for review of reasonableness in prospective peak cases would run contrary to the Act's policy of placing a 'premium on speed and finality in deciding the results of elections.' [Citation.] Furthermore, and more importantly, 'it might encourage employers to file groundless objections in prospective peak cases in order to preserve the possibility of ultimately showing that the peak determination, although reasonably made, was incorrect in light of subsequent events. The proposed approach might also encourage employers to manipulate the size of their workforces after elections in order to defeat certification. Furthermore, . . . this approach might discourage employers from cooperating fully in peak investigations.' [Citation.]" (169 Cal.App.3d at p. 258.) It is for this reason that the test is whether the regional director's determination was a reasonable one in light of the information available at the time of the investigation.

Scheid also contends it raised "novel legal issues," to wit: (1) whether the standard of review consistently being used in ALRB cases should be applied in the "prospective peak" cases (this issue is not novel: the standard has been applied in prospective peak cases—see e.g., *Charles Malovich, supra*, 5 ALRB No. 33, and *Domingo Farms* (1979) 5 ALRB No. 35); (2) whether a party can "waive" the ALRB's alleged "lack of jurisdiction" (this argument is premised on the assumption that the ALRB has no jurisdiction under section Labor Code 1156.4 to consider a petition when the employer is below 50 percent of peak; however, section 1156.4 actually states that the

---

[3]One hundred twenty-three of these agricultural workers were provided by a labor contractor during the week of September 20, 1992. The California Supreme Court has ruled that workers employed by a labor contractor are to be included in the bargaining unit and may vote in an ALRB election. (*Vista Verde Farms* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307, 323-324 [172 Cal.Rptr. 720, 625 P.2d 263].)

board shall not consider a petition unless ". . . the employer's payroll reflects 50 percent of the peak agricultural employment for such employer . . . ." Scheid's payroll [both the 150 figure and the 132 figure] reflected more than 50 percent of both the 1991 actual peak and the 1992 anticipated peak); (3) whether, on the facts of this case, a hearing on Scheid's objections to the election should have been held. (As the facts of every case are different, "novel" has to mean something other than different facts. However, no hearing should have been held here because Scheid did not make a prima facie showing that the regional director's determination was unreasonable in light of the information available to him when he made the determination.) Thus, Scheid has not raised any "novel legal issues."

In sum, the record sufficiently supports the ALRB's conclusion that "makewhole" was appropriate. This was neither a "close case" nor were "novel" issues raised. The election was large, the voter turnout was 100 percent, and the election results were overwhelmingly in favor of representation.

The decision of the ALRB is affirmed.

Bamattre-Manoukian, J., and Mihara, J., concurred.

A petition for a rehearing was denied January 28, 1994, and petitioner's application for review by the Supreme Court was denied April 13, 1994.